67 A.3d 621

IN RE N.J.A.C. 7:1B–1.1 ET SEQ.

Superior Court of New Jersey
Appellate Division

Argued January 14, 2013—Decided March 21, 2013.

102

Before Judges PARRILLO, SABATINO and FASCIALE.

*Edward Lloyd* argued the cause for appellants American Littoral Society Association of New Jersey Environmental Commissions, Clean Ocean Action, Communications Workers of America, Delaware Riverkeeper Network, Edison Wetlands Association, Environment New Jersey, Food and Water Watch, Hackensack Riverkeeper, Health Professionals and Allied Employees, Hopewell Valley Citizens Group, New Jersey Audubon Society, New Jersey Environmental Federation, New Jersey Environmental Lobby, New Jersey Highlands Coalition, New Jersey Public Employees for Environmental Responsibility, New Jersey State Industrial Union Council, New York/New Jersey BayKeeper, Raritan Headwaters Association, Pinelands Preservation Alliance, Save Barnegat Bay, Sierra Club (New Jersey Chapter), Sourland Planning Council, Stony Brook–Millstone Watershed Association,

Teamsters 877, Union of Rutgers Administrators (American Federation of Teachers Local 1766), United Steelworkers District Four, and Work Environmental Council of New Jersey in Docket No. A–3514–11T2 (*Morningside Heights Legal Services, Inc., Environmental Law Clinic, Columbia Law School,* attorneys; *Mr. Lloyd* and *Susan J. Kraham,* on the brief).

*Gasiorowski & Holobinko,* attorneys for appellant Michael Perlmutter in Docket No. A–4098–11T2, join in the brief of appellants in Docket No. A–3514–11T2.

*Dean Jablonski,* Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection in Docket Nos. A–3514–11T2 and A–4098–11T2 (*Jeffrey S. Chiesa,* Attorney General, attorney; *Robert T. Lougy* and *Lewis A. Scheindlin,* Assistant Attorneys General, of counsel; *Mr. Jablonski,* on the consolidated brief).

*Paul H. Schneider* argued the cause for amicus curiae New Jersey Builders Association (*Giordano, Halleran & Ciesla,* attorneys; *Mr. Schneider* and *Afiyfa H. Ellington,* on the brief).

*Peter J. Gallagher* argued the cause for amicus curiae New Jersey Business & Industry Association (*Porzio, Bromberg & Newman, P.C.,* attorneys; *Peter J. Wolfson,* of counsel; *Mr. Gallagher* and *Gregory S. Ricciardi,* on the brief).

*Dennis M. Toft* argued for amici curiae American Petroleum Institute, New Jersey Chamber of Commerce and NAIOP New Jersey Chapter, Inc. (*Wolff & Samson, P.C.,* attorneys; *John G. Valeri, Jr., Mr. Toft* and *Daniel T. McKillop,* on the brief).

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

In response to Executive Order No. 2(EO2), mandating State agencies to adopt rules for waiver to "ensure that regulations shall be efficient, consistent ..., accessible and transparent to all interested parties," 42 *N.J.R.* 577(a)–78 (Feb. 16, 2010), the Department of Environmental Protection (DEP or the Department) proposed new regulations entitled "Waiver of Department Rules,"

to be designated as *N.J.A.C.* 7:1B–1.1 to –2.4 (the waiver rules). 43 *N.J.R.* 473(a)–78 (Mar. 7, 2011) (proposal). Following public hearing and comment,[1] DEP's Commissioner adopted the rules, with certain modifications, on March 6, 2012, 44 *N.J.R.* 981(b)– 1047, to be effective April 2, 2012, 44 *N.J.R.* 981–82, and then published them in the *New Jersey Register,* 44 *N.J.R.* 981, 986 (Apr. 2, 2012). Thereafter, twenty-eight environmental and labor organizations, led by the American Littoral Society, united to appeal the DEP's promulgation.[2]

Appellants argue that the waiver rules exceed DEP's legislated authority and, in any event, are facially invalid due to the lack of adequate standards to guide the agency's discretion and implementation. They also challenge DEP's guidance documents and many of the other postings on DEP's website created exclusively for the waiver rules after their adoption, as *de facto* rulemaking in violation of the Administrative Procedures Act (APA), *N.J.S.A.* 52:14B–1 to –15.[3] For reasons that follow, we uphold DEP's authority to promulgate the waiver rules and find they contain adequate standards. We reject, however, the documents posted on the agency's website as violative of the APA.

## I

By way of background, EO2 was issued on January 20, 2010,[4] "establishing 'Common Sense Principles' for State rules and regu-

---

[1] Over 528 persons submitted written and/or oral comments, with the majority opposing the proposal. 44 *N.J.R.* 982–86.

[2] Appellant Michael Perlmutter filed a separate appeal and the two appeals were administratively listed as back-to-back for calendaring purposes (hereinafter, "appellants" refers to all appellants in both appeals, unless named individually).

[3] The Commissioner denied appellants' motion for a stay and interim relief as did this court.

[4] EO2 was thereafter published in the *New Jersey Register* on February 16, 2010.

lations that will give this State the opportunity to energize and encourage a competitive economy to benefit businesses and ordinary citizens; . . . ." 42 *N.J.R.* 577(a). Accordingly, "[f]or immediate relief from regulatory burdens," EO2 directed "all agencies," in part, to:

c. Adopt rules for "waivers" which recognize that rules can be conflicting or unduly burdensome and shall adopt regulations that allow for waivers from the strict compliance with agency regulations and such waivers shall not be inconsistent with the core missions of the agency. Each State agency shall prepare and publish on its website a policy describing the circumstances in which such waivers will be granted.

[EO2, § 1(c), 42 *N.J.R.* 577(a).]

"For long-term relief from regulatory burdens," EO2 directed "all agencies," in part, to:

c. Focus all proposed rules on achieving outcomes rather than on the process used to achieve compliance and be based on the best scientific and technical information that can be reasonably obtained and designed so that they can be applied consistently.

[EO2, § 3(c), 42 *N.J.R.* 578.]

Notwithstanding those findings and directives, the Governor made it clear that EO2 was

not intended to, and does not confer any legal rights upon businesses or others whose activities are regulated by New Jersey's agencies, . . . and shall not be used as a basis for legal challenges to rules, approvals, permits, licenses or other actions or to any inaction of the governmental entity subject to it.

[EO2, § 6, 42 *N.J.R.* 578.]

Although acting almost immediately after the Governor's mandate, DEP made clear that the agency was "not draw[ing] its authority to promulgate the waiver rules from Executive Order No. 2, but from its comprehensive legislation." 44 *N.J.R.* 1001. Relying on this delegated legislative authority, DEP explained its reasons for proposing the waiver rules:

With decades of rulemaking experience and implementing its regulatory programs, it is clear to the Department that no administrative rule, however carefully crafted it may be, can possibly anticipate each and every factual circumstance that might fall within the purview of the waiver rules. While the Department attempts to craft its rules to address the factual scenarios that might be reasonably anticipated, unanticipated situations do arise that may warrant relief from strict compliance with an existing rule.

[44 *N.J.R.* 1002.]

As *N.J.A.C.* 7:1B–1.1 further makes plain, DEP's purpose was

to set forth the limited circumstances in which the Department may, in its discretion, waive the strict compliance with any of its rules in a manner consistent with the core missions of the Department to maintain, protect, and enhance New Jersey's natural resources and to protect the public health, safety, and welfare, and the environment.

To that end, the rules establish several critical steps containing discrete requirements that a waiver applicant must meet before approval.

First, the applicant, to be successful, must demonstrate that its request complies with one of four threshold requirements, or bases, to obtain a waiver. *N.J.A.C.* 7:1B–2.1(a) lists the four thresholds: (1) "[c]onflicting rules"; (2) "strict compliance with the rule would be unduly burdensome"; (3) "net environmental benefit"; *or* (4) "public emergency." These terms are defined in *N.J.A.C.* 7:1B–1.2:

"Conflicting rules" means a situation in which two or more Department rules, or a Department rule and the rule of another State agency or a Federal agency, conflict so as to make compliance with both rules impossible or impracticable.

"Unduly burdensome" means a situation in which the strict compliance with a specific Department rule would result in either:

1. Actual, exceptional hardship for a particular project or activity, or property; or

2. Excessive cost in relation to an alternative measure of compliance that achieves comparable or greater benefits to public health and safety or the environment.

"Net environmental benefit" means a situation in which the quantitative or qualitative benefit to a natural resource or other related environmental good for which the Department has responsibility would substantially outweigh any detriment to that natural resource or environmental good, which would result from a waiver. There must be an adequate geographic and resource nexus between the environmental offset and the natural resource or other environmental good that is protected by the rule being waived. The net environmental benefit may include mitigation, but it must be beyond what the waived rule would have required independent of the waiver.

"Public emergency" means a situation in which a Federal or State official with the authority to do so declares a public emergency.

Second, the applicant must demonstrate that its waiver request does not fall within certain prohibitions expressed within the

waiver rules. *N.J.A.C.* 7:1B–2.1(b) identifies thirteen categories of DEP's rules and requirements that cannot be waived:

1. A requirement of, or duty imposed by, a Federal or State statute or [f]ederal regulation, unless that statute or regulation provides for such a waiver;

2. A rule providing for a [f]ederally delegated, authorized, or assumed program where the waiver would not be consistent with New Jersey's delegation, authorization, or assumption of authority pursuant to a Federal program;

3. A rule that implements a [f]ederally enforceable program pursuant to a State Implementation Plan (SIP), as defined at *N.J.A.C.* 7:27–18.1;

4. A rule that is part of a collaborative program involving multiple states or jurisdictions where the waiver would not be consistent with New Jersey's participation in the multi-state or multi-jurisdiction program;

5. A rule concerning the air emissions trading program;

6. A rule providing for a numeric or narrative standard protective of human health;

7. A rule concerning the designation of rare, threatened, or endangered status of any species of flora or fauna, or habitat for such species;

8. A rule providing for a remediation funding source, claim or other reimbursement, grant, loan, or other financial assistance;

9. A rule providing for a license, certification, or registration for a vehicle, boat, individual, or business;

10. A rule providing for a license or approval for hunting, fishing, or trapping;

11. A rule providing for public participation or notice;

12. A rule providing for a fee, over-sight cost, or other Department cost; or

13. Any provision of this chapter.

Moreover, no waiver can be granted that would conflict with any of DEP's "core missions ... to maintain, protect, and enhance New Jersey's natural resources and to protect the public health, safety, and welfare, and the environment." *N.J.A.C.* 7:1B–1.1; *N.J.A.C.* 7:1B–2.2(a)(6).

Third, the applicant's request, to be successful, must satisfy various specific evaluation criteria. *N.J.A.C.* 7:1B–2.2, which delineates those criteria, provides:

(a) The Department shall consider the extent to which the following criteria support a waiver of the strict compliance with a rule in accordance with this chapter:

1. The public has had sufficient notice of the waiver in accordance with applicable rules;

2. The Department has been provided with information and data sufficient to support a waiver;

3. There are circumstances that support the need for a waiver;

4. The person seeking the waiver may have directly caused or contributed to the circumstances that resulted in the rule being unduly burdensome;

5. There is a net environmental benefit, including the consideration, when appropriate, of the impact of the waiver on the remediation and redevelopment of a contaminated site, or on the expansion of an existing development;

6. The waiver would be consistent with the Department's core missions to maintain, protect, and enhance New Jersey's natural resources and to protect public health, safety, and welfare, and the environment; and

7. The waiver would result in a reasonable and effective response to a public emergency.[5]

After it adopted the waiver rules, DEP posted a waiver rule "homepage" on its website.[6] This homepage includes links to subpages that provide additional and specific information concerning waiver rule prohibitions, waiver rule guidance, public notice requirements, frequently asked questions (FAQs), and DEP contact information.

These subpages also link to information in a July 2012 "Guidance Document For Requests Pursuant to *N.J.A.C.* 7:1B" that provides specific instructions to waiver applicants, including what they should "consider," and what statements, reports, demonstrations, or other evidence they need to submit prior to DEP's review and evaluation. For example, this guidance document requires the waiver applicant to describe with specificity the circumstances that give rise to the exceptional hardship and/or excessive cost claims. It also declares that applicants seeking to qualify on the basis of net environmental benefit will be required to submit a detailed statement that compares the environmental benefit of the natural resource or related environmental good protected, which would be waived, to the environmental offset that would be

---

[5] Also, *N.J.A.C.* 7:1B–2.2 lists various criteria that DEP must consider and evaluate before granting a waiver request; *N.J.A.C.* 7:1B–2.3 lists notice requirements for waiver applicants and for DEP; and *N.J.A.C.* 7:1B–2.4 lists what must be included in DEP's decision approving or denying the request, and the effects and limitations of an approval.

[6] *See* DEP's Waiver Rule, http://www.state.nj.us/dep/waiverrule/ (last visited Feb. 20, 2013).

provided. And it states that a waiver based on conflicting rules will only be granted on the basis of impossibility ("cannot physically or temporally comply with both rules") or impracticability ("possible to comply with both rules but extremely or unreasonably difficult to do so"). Lastly, the document states which specific authority is required to declare the public emergency that can lead to waiver of a regulation.

To help applicants comply with notice requirements, DEP's website provides a link to a public notice rules summary chart, since waiver requests, pursuant to *N.J.A.C.* 7:1B–2.3, must contain proof that the applicant complied with any public notice requirements applicable to the underlying program rules.

The website's subpages also contain another guidance document, "Guidance for Delegation, Authorization, and Assumption," listing which "program rules ... in whole, or in part," are not available for regulatory waivers.

Additionally, DEP's subpage of FAQs lists twenty-nine general questions and answers, concerning specific administrative procedures for applicants. For example, one question is whether "an approved waiver [is] transferable to another party." Other questions concern how DEP will inform the public and applicants on waiver applications, and whether the public will have an opportunity to comment on waiver requests.[7] Another FAQs subpage

---

[7] With regard to the transparency with which waiver applications will be evaluated, the Commissioner has assured:

> As stated at *N.J.A.C.* 7:1B–2.3(b) and (c) of the Waiver Rule, the Department will publish notice of its determination to consider all waiver requests and its ultimate decision on each waiver request in the following ways: on the DEP's Waiver webpage ... and, where appropriate, in the DEP Bulletin (which is an on-line publication) for waiver requests/decisions relating to a rule for which the Department publishes notice of permit decisions in the DEP Bulletin. The Department is confident that these public notice requirements will ensure that the public will be fully and timely informed of all Department waiver decisions.

[Commissioner's July 18, 2012 order denying appellants' motion for interim relief and a stay of the rules' operative date.]

involves program-specific questions and answers concerning an applicant's compliance with DEP's compliance and enforcement, environmental management, land use regulation, site remediation, and water resource management programs.

## II

Appellants contend that DEP's "blanket" waiver rules are ultra vires because, although the Legislature has expressly authorized specific statutory exemptions in very limited "program specific" instances, there is no comprehensive legislative scheme allowing for a broad, single-set relaxation rule of universal application. DEP and amici counter that such authority is implied in various enabling laws the agency has been mandated to execute and is incidental to the extensive regulatory powers vested in the agency by those laws. In other words, DEP maintains that "[w]here the Department has the authority to promulgate rules, it also has the authority to modify or waive those rules, provided that the modification or waiver does not violate a statutory requirement or purpose." 44 *N.J.R.* 987.

In deciding this issue, we first look to some well-established standards for reviewing the validity of an agency's regulations.

Agency regulations are accorded a presumption of validity and reasonableness. *In re Petition of N.J. Am. Water Co.,* 169 *N.J.* 181, 188, 777 *A.2d* 46 (2001); *In re Adoption of N.J.A.C. 7:26B,* 128 *N.J.* 442, 449, 608 *A.2d* 288 (1992); *Bergen Pines Cnty. Hosp. v. N.J. Dep't of Human Servs.,* 96 *N.J.* 456, 477, 476 *A.2d* 784 (1984); *A.A. Mastrangelo, Inc. v. Comm'r of Dep't of Envtl. Prot.,* 90 *N.J.* 666, 683, 449 *A.2d* 516 (1982); *N.J. Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 561, 384 *A.2d* 795 (1978). Although not bound by an agency's determination on a question of law, *In re Distribution of Liquid Assets Upon Dissolution of Union Cty. Reg. High Sch. Dist. No. 1,* 168 *N.J.* 1, 11, 773 *A.2d* 6 (2001), our courts give " 'great deference' " to an agency's " 'interpretation of statutes within its scope of authority and its adoption of rules implementing' the laws for which it is

responsible." *N.J. Ass'n of Sch. Adm'rs v. Schundler,* 211 *N.J.* 535, 549, 49 *A.*3d 860 (2012) (quoting *N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric.,* 196 *N.J.* 366, 385, 955 *A.*2d 886 (2008)); *see also In re Election Law Enforcement Comm'n Advisory Op. No. 01–2008,* 201 *N.J.* 254, 262, 989 *A.*2d 1254 (2010). "This deference comes from the understanding that a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise." *Ibid.; accord Newark v. Natural Res. Council,* 82 *N.J.* 530, 539–40, 414 *A.*2d 1304, *cert. denied,* 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.*2d 245 (1980).

Indeed, when reviewing an administrative agency's promulgation of a rule, it is not our function "to assess the wisdom of the agency's decision, but only its legality." *N.J. Ass'n of Nurse Anesthetists, Inc. v. N.J. State Bd. of Med. Exam'rs,* 183 *N.J.* 605, 610, 875 *A.*2d 247 (2005). "Our function is to rule on whether the subject matter falls within the substantive authority delegated to the agency and whether the rule was enacted in accordance with applicable legal principles." *Ibid.*

In this regard, the promulgation of administrative rules and regulations lies at the very heart of the administrative process, permitting "expert and flexible control in areas where the diversity of circumstances and situations to be encountered forbids the enactment of legislation anticipating every possible problem which may arise and providing for its solution." *Cammarata v. Essex Co. Park Comm.,* 26 *N.J.* 404, 410, 140 *A.*2d 397 (1958). As such, "[t]he basic purpose of establishing agencies to consider and promulgate rules is to delegate the primary authority of implementing policy in a specialized area to governmental bodies with the staff, resources and expertise to understand and solve those specialized problems." *Bergen Pines Cnty. Hosp., supra,* 96 *N.J.* at 474, 476 *A.*2d 784.

One of the acknowledged advantages of the administrative process "has been its flexibility in enabling administrators to deal

justly with unanticipated as well as anticipated situations in accordance with general legislative guides." *Ward v. Scott,* 11 *N.J.* 117, 127, 93 *A.*2d 385 (1952). Administrative agencies are entitled to change their interpretation of a statute over time. *Glukowsky v. Equity One, Inc.,* 180 *N.J.* 49, 65, 848 *A.*2d 747 (2004), *cert. denied,* 543 *U.S.* 1049, 125 *S.Ct.* 864, 160 *L.Ed.*2d 770 (2005). "A regulatory agency is charged with the responsibility of adapting its regulations to changing conditions when enforcing a statute under its authority." *Id.* at 67, 848 *A.*2d 747. "Regulatory law . . . is not static. It has elasticity that permits it to adapt to changing circumstances and conditions." *Ibid.* Obviously, such flexibility is not without limits and does not allow an agency to be operated in a manner unfaithful to the governing statute.

Consequently, "[i]n reviewing agency action, the fundamental consideration is that a court may not substitute its judgment for the expertise of an agency 'so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable.'" *Williams v. Dep't of Human Servs.,* 116 *N.J.* 102, 107, 561 *A.*2d 244 (1989) (quoting *Dougherty v. Dep't of Human Servs.,* 91 *N.J.* 1, 12, 449 *A.*2d 1235 (1982)); *accord In re Distribution of Liquid Assets, supra,* 168 *N.J.* at 10, 773 *A.*2d 6. In fact, a court may not invalidate a regulation provided it is "'within the fair contemplation of the delegation of the enabling statute.'" *N.J. Guild, supra,* 75 *N.J.* at 561–62, 384 *A.*2d 795 (quoting *S. Jersey Airways, Inc. v. Nat'l Bank of Secaucus,* 108 *N.J.Super.* 369, 383, 261 *A.*2d 399 (App.Div.1970)). And in deciding whether a particular agency action is authorized, a court "may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives." *Id.* at 562, 384 *A.*2d 795.

By the same token, an administrative agency may not give itself authority not legislatively delegated. *Cooper Univ. Hosp. v. Jacobs,* 191 *N.J.* 125, 141, 922 *A.*2d 731 (2007). An agency possesses only "expressly granted" powers and "those incidental powers which are reasonably necessary or appropriate

to effectuate the specific delegation," and "to enable [it] to accomplish its statutory responsibilities." *N.J. Guild, supra,* 75 *N.J.* at 562, 384 *A.*2d 795 (internal quotation marks omitted); *see also In re Virtua–West Jersey Hosp. Voorhees for a Certificate of Need,* 194 *N.J.* 413, 422–23, 945 *A.*2d 692 (2008) ("[A]n agency's authority encompasses all express and implied powers necessary to fulfill the legislative scheme that the agency has been entrusted to administer."). Regulations, however, "cannot alter the terms of a statute or frustrate the legislative policy." *Med. Soc'y of N.J. v. N.J. Dep't of Law & Pub. Safety,* 120 *N.J.* 18, 25, 575 *A.*2d 1348 (1990). For example, "an administrative agency may not, under the guise of interpretation, extend a statute to give it a greater effect than its language permits." *GE Solid State, Inc. v. Dir., Div. of Taxation,* 132 *N.J.* 298, 306, 625 *A.*2d 468 (1993); *see also, Serv. Armament Co. v. Hyland,* 70 *N.J.* 550, 563, 362 *A.*2d 13 (1976) ("[A]dministrative interpretation which attempts to add to a statute something which is not there can furnish no sustenance to the enactment."); *In re Freshwater Wetlands Prot. Act Rules, N.J.A.C. 7:7A–1.1 et seq.,* 238 *N.J.Super.* 516, 526–30, 570 *A.*2d 435 (App.Div.1989) (finding regulation imposing five-year limit on statutory exemption from permit and transition area requirements of Freshwater Wetlands Protection Act was ultra vires because it improperly limited statutory exemption, which was silent on duration of such exemptions).

"Where there exists reasonable doubt as to whether [a particular] power is vested in the administrative body, the power is denied." *In re Closing of Jamesburg High Sch.,* 83 *N.J.* 540, 549, 416 *A.*2d 896 (1980); *accord Swede v. City of Clifton,* 22 *N.J.* 303, 312, 125 *A.*2d 865 (1956). And when an administrative agency's rule or regulation contravenes the statute which created it, the rule "will be set aside." *In re Freshwater Wetlands Prot. Act Rules,* 180 *N.J.* 478, 489, 852 *A.*2d 1083 (2004); *see also Des Champs Laboratories, Inc. v. Martin,* 427 *N.J.Super.* 84, 47 *A.*3d 25 (App.Div.2012) (invalidating, as ultra vires, a DEP regulation that was in conflict with the terms and enumerated objectives of

the applicable statute).[8] Accordingly, the party challenging a regulation has the burden of "demonstrating an inconsistency between the regulation and the statute it implements, a violation of policy expressed or implied by the Legislature, an extension of the statute beyond what the Legislature intended, or a conflict between the enabling act and other statutory law that cannot be harmonized." *N.J. Ass'n of Sch. Adm'rs v. Cerf,* 428 *N.J.Super.* 588, 595–96, 55 *A.*3d 74 (App.Div.2012).

With these general principles in mind, we proceed to address the issue at hand. As previously noted, the Legislature has expressly authorized specific statutory waivers and/or exemptions in limited instances in various comprehensive legislative acts. For example, in the Flood Hazard Area Control Act, *N.J.S.A.* 58:16A– 55(b) states that "[p]rovision shall be made by the department for the waiver, according to definite criteria, of strict compliance with the rules and regulations, where necessary to alleviate hardship." *See also, e.g., N.J.S.A.* 13:1E–4 (Solid Waste Management Act); *N.J.S.A.* 13:1E–48.4(b) (Comprehensive Regulated Medical Waste Management Act); *N.J.S.A.* 13:1K–11.4 (Industrial Site Recovery Act); *N.J.S.A.* 13:9B–18(a) (Freshwater Wetlands Protection Act); *N.J.S.A.* 13:19–5.3 and –6 (Coastal Area Facility Review Act ("CAFRA")); *N.J.S.A.* 13:20–33(b) (Highlands Water Protection and Planning Act); *N.J.S.A.* 26:2C–9.8(b) (Air Pollution Control Act); *N.J.S.A.* 58:10B–2(b) (Brownfield and Contaminated Site Remediation Act), *N.J.S.A.* 58:12A–5 (Safe Water Drinking Act). Consequently, DEP has adopted waiver provisions in regulations relating to these particular environmental policies. *See, e.g., N.J.A.C.* 7:7–1.10 (takings waiver in Coastal Permit Program Rules); *N.J.A.C.* 7:13–9.8 (hardship waiver in Flood Hazard Area

---

[8] The New Jersey Constitution authorizes the Legislature to "review any rule or regulation to determine if the rule or regulation is consistent with the intent of the Legislature as expressed in the language of the statute which the rule or regulation is intended to implement." *N.J. Const.,* art. V, § IV, ¶ 6. Under the amendment, if the Legislature finds that "an existing or proposed rule or regulation is not consistent with legislative intent," it may invalidate that rule or regulation or prevent it from taking effect.

Control Act Rules); *N.J.A.C.* 7:7A–17.1 (takings waiver in Freshwater Wetlands Protection Act Rules); *N.J.A.C.* 7:15–5.25(g) and (h) (hardship waivers in Water Quality Management Planning Rules).

 Appellants point to these provisions as evidence that when the Legislature intends to delegate such waiver authority to DEP, it does so clearly, explicitly, and selectively. To be sure, "when the Legislature includes limiting language in one part of a statute, but leaves it out of another section in which the limit could have been included, [our courts] infer that the omission was intentional." *Ryan v. Renny*, 203 *N.J.* 37, 58, 999 *A.*2d 427 (2010). Indeed, we "need not strain to import that requirement where it is not." *In re Freshwater Wetlands Prot. Act Rules, supra*, 180 *N.J.* at 492, 852 *A.*2d 1083.

 By the same token, a reviewing court "may consider the entire enabling legislation in order to ascertain 'if there is in fact sufficient underlying authority.' " *N.J. Guild, supra*, 75 *N.J.* at 561, 384 *A.*2d 795 (quoting *In re Weston*, 36 *N.J.* 258, 263, 176 *A.*2d 479 (1961), *cert. denied*, 369 *U.S.* 864, 82 *S.Ct.* 1029, 8 *L.Ed.*2d 84 (1962)). "The ultimate question is whether the agency's interpretation is permissible under the broad language of the statute." *In re Adoption of N.J.A.C. 7:26B, supra*, 128 *N.J.* at 450, 608 *A.*2d 288.

So viewed, it becomes clear that in effectuating legislative policy, DEP has been entrusted with extensive rulemaking powers in both its originating statute, *N.J.S.A.* 13:1D–9 (DEP "shall formulate comprehensive policies for the conservation of the natural resources of the State, the promotion of environmental protection and the prevention of pollution of the environment of the State."), and in scores of comprehensive acts too numerous to enumerate. *See, e.g., N.J.S.A.* 13:1E–99.21f, –99.30, –99.35 ("adopt rules and regulations necessary to implement [provisions of Solid Waste Management Act]"); *N.J.S.A.* 13:9B–25(a) (adopt "any rules and regulations necessary to implement [Freshwater Wetlands Protection Act]"); *N.J.S.A.* 58:1A–7.4(b) (adopt "rules and

regulations necessary to implement [Water Supply Management Act]"); *N.J.S.A.* 58:11A–16 (adopt "any rules and regulations necessary to implement [Water Quality Planning Act]"); *N.J.S.A.* 58:10A–4 (adopt "reasonable codes, rules and regulations" to implement Water Pollution Control Act).

DEP has implemented its rulemaking mandate by, at times, adopting wide-ranging regulatory frameworks applicable to multiple departmental programs under different statutes. 44 *N.J.R.* 1015. For example, the Coastal Permit Program Rules, *N.J.A.C.* 7:7–1.1 to –10.7, establish procedures by which DEP reviews permit applications and appeals from permit decisions under CAFRA, the Wetlands Act of 1970, and the Waterfront Development Law. *See N.J.A.C.* 7:7–1.1(a). Indeed, *N.J.A.C.* 7:7–1.10 provides that DEP may, in its discretion, relax the procedures in those rules, and also that it may reconsider the application of substantive standards in the Coastal Zone Management Rules, *N.J.A.C.* 7:7E–1.1 to –8.22, which are used in reviewing permit applications under CAFRA, the Wetlands Act, and the Waterfront Development Law. Similarly, DEP's Stormwater Management Rules, *N.J.A.C.* 7:8–1.1 to –6.3, apply to programs under the Municipal Land Use Law, Water Quality Planning Act, the Water Pollution Control Act, the Flood Hazard Area Control Act, CAFRA, the Wetlands Act of 1970, the Freshwater Wetlands Protection Act, the Waterfront Development Law, and the Dam Safety Act. *See N.J.A.C.* 7:8–1.1(a)–(b). And DEP's regulations at *N.J.A.C.* 7:18 govern the certification of laboratories performing sample analyses for compliance with many statutes, and establish the criteria and procedures that certified environmental laboratories must follow in collecting, handling, preserving, and analyzing regulatory samples in connection with various agency programs under many statutory acts. These include, but are not limited to the Safe Drinking Water Act, the Water Pollution Control Act, the Solid Waste Management Act, the Air Pollution Control Act, and the Industrial Site Recovery Act. *See N.J.A.C.* 7:18–1.1(a)(b)(c).

Thus, although specific enabling statutes direct DEP to promulgate rules for the regulatory program created therein, there can be no question, given the overall legislative scheme, that DEP is empowered to adopt regulations more "universal" in nature and of more general applicability to deal comprehensively, in a single set of rules, with the sheer scope of overlapping statutory programs the agency must administer as well as with the volume of interconnected activities the Commissioner must coordinate amongst the agency's various divisions. *See N.J.S.A.* 13:1B–3(i) (The Commissioner has the authority to "[c]o-ordinate the activities of the department . . . in a manner designed to eliminate overlapping and duplicating functions."). Indeed, appellants point to no authority that DEP cannot cut across intramural boundaries by adopting department-wide rules to deal with overlapping concerns or subjects.[9] To the contrary, we have earlier upheld DEP's

---

[9] For instance, within the DEP itself, the goal of the agency's Site Remediation Program is to address human health concerns while the goal of the agency's Office of Natural Resource Restoration, when dealing with the same remediation site, is to seek: (1) primary restoration damages to guarantee that the injured natural resource will be returned to its pre-discharge condition; and (2) compensatory resource damages to compensate the public for the amount of time that its resource was contaminated before it was returned to its pre-discharge condition. *N.J. Dep't of Envtl. Prot. v. Essex Chem. Corp.*, No. A–0367–10, 2012 *WL* 913042, *2 (App.Div. Mar. 20, 2012).

Moreover, some statutory schemes under DEP's purview have differing goals or weigh particular objectives differently. Compare and contrast, for example, the Highlands Water Protection and Planning Act, wherein the Legislature declares in part in *N.J.S.A.* 13:20–2 that the "residential, commercial, and industrial development, redevelopment, and economic growth in certain appropriate areas of the New Jersey Highlands are also in the best interests of all the citizens of the State, providing innumerable social, cultural, and economic benefits and opportunities," with the Pollution Prevention Act, wherein the Legislature, in *N.J.S.A.* 13:1D–36, declares "a new emphasis on pollution prevention" and that a "soundly planned pollution prevention program can be implemented without adversely affecting the State's economic health or the livelihood of those employed by industries that use and discharge hazardous substances."

The waiver rules before us have not eviscerated these legislative distinctions because they require the applicant's adherence to statutory requirements. *N.J.A.C.* 7:1B–2.1(b)(1).

authority to adopt a uniform set of rules that apply to different environmental programs and rules under various statutes. *In re Stormwater Mgmt. Rules*, 384 *N.J.Super.* 451, 461–64, 894 *A.*2d 1241 (App.Div.), *certif. denied*, 188 *N.J.* 489, 909 *A.*2d 724 (2006); *Soc'y for Envtl. Econ. Dev. v. N.J. Dep't of Envtl. Prot.*, 208 *N.J.Super.* 1, 7–8, 504 *A.*2d 1180 (App.Div.1985) ("The broad scope of environmental concerns expressed by the Legislature in its various enactments and the totality of powers accorded by the Legislature to DEP to enable it to address those concerns persuades us that DEP has ample power to deal comprehensively in a single set of regulations with overlapping areas.").

No court, however, has yet to directly address the scope of an agency's power to waive its regulations, more particularly, to adopt a uniform waiver rule applicable to most of its regulations. Nevertheless, on a more limited, program-specific basis, and in the absence of an express legislative grant or prohibition, courts have recognized the inherent authority of state agencies to waive their regulatory requirements through regulations adopted pursuant to the APA and which establish appropriate standards for the exercise of the agency's waiver decision-making, while still honoring requirements imposed by statutes or by federal law.

One of the first published cases to address agency suspension of a regulation was *Iuppo v. Burke*, 162 *N.J.Super.* 538, 394 *A.*2d 96 (App.Div.), *certif. denied*, 79 *N.J.* 462, 401 *A.*2d 219 (1978). In that case, the Commissioner of Education refused to comply with

---

Also compare and contrast the Freshwater Wetlands Act, wherein the Legislature declares in part in *N.J.S.A.* 13:9B–2, that "it shall be the policy of the State to preserve the purity and integrity of freshwater wetlands from random, unnecessary or undesirable alteration or disturbance," with CAFRA, wherein the Legislature, in *N.J.S.A.* 13:19–2, "recognizes the legitimate economic aspirations of the inhabitants of the coastal area and wishes to encourage the development of compatible land uses in order to improve the overall economic position of the inhabitants of that area within the framework of a comprehensive environmental design strategy which preserves the most ecologically sensitive and fragile area from inappropriate development and provides adequate environmental safeguards for the construction of any developments in the coastal area."

a regulation to annually classify school districts in the first year that the regulation was in effect, and the State Board "concurred." *Id.* at 540–41, 394 *A.*2d 96. The court found that the Commissioner and the State Board were "bound by duly promulgated rules and regulations," so "[t]he legal issue [was] simply whether the State Board improperly suspended its regulation without formal amendment, or whether it merely interpreted and applied the existing regulation in the light of prevailing circumstances." *Id.* at 549, 394 *A.*2d 96 (citations omitted). The court found that the State Board's decision had the effect of reading an exception into the regulation, which could only be accomplished through formal rulemaking pursuant to the APA. *Id.* at 550–52, 394 *A.*2d 96.

In *SMB Associates v. New Jersey Department of Environmental Protection,* 264 *N.J.Super.* 38, 40–42, 624 *A.*2d 14 (App.Div. 1993), *aff'd on other grounds,* 137 *N.J.* 58, 644 *A.*2d 558 (1994), SMB Associates sought to build various projects on an undeveloped bay island, even though it did not meet CAFRA's permit requirements. We held that DEP could not waive its regulations in the absence of a duly promulgated regulation "authorizing waivers and establishing appropriate standards for the exercise of waiver authority." *Id.* at 50, 624 *A.*2d 14. The Supreme Court, however, never reached the issue, declaring that it "need not resolve in this case the breadth of an agency's power to waive regulatory requirements or whether a rule authorizing waiver is always necessary." *SMB Assocs., supra,* 137 *N.J.* at 60, 644 *A.*2d 558.

The Supreme Court in *In re CAFRA Permit No. 87–0959–5 Issued to Gateway Associates,* 152 *N.J.* 287, 306, 704 *A.*2d 1261 (1997), was faced with a waiver case wherein DEP had adopted regulations concerning the waiver of its procedural rules governing CAFRA, but not its substantive rules. In dicta, the Court declared: "The DEP would have better served the public interest had it adopted a regulation pertaining to the waiver of substantive considerations...." *Ibid.* Although it did not need to consider "whether an administrative agency has the inherent power to

waive its substantive regulations," *ibid.*, the Court ·nevertheless declared: "[A]n agency that seeks the power to waive its substantive regulations should adopt a regulation pertaining to any such waiver and setting forth appropriate standards to govern agency decision-making," *id.* at 308, 704 *A.*2d 1261.

Thereafter, in *County of Hudson v. Department of Corrections,* 152 *N.J.* 60, 64, 703 *A.*2d 268 (1997), the Department of Corrections refused two counties' demands that it comply with its regulation requiring the transfer of state-sentenced juveniles to state facilities within three days of notice of sentencing. The Court stated that "[a]bsent a statute *or regulation* authorizing the waiver of otherwise valid and enforceable administrative regulations, an agency generally should not waive its own duly-enacted regulations by disregarding them." *Id.* at 71, 703 *A.*2d 268 (emphasis added). The Court declared that "[i]n general, an agency has the authority to amend, change, or repeal its regulations, especially in response to changing conditions." *Id.* at 72, 703 *A.*2d 268.

And in *Cooper University Hospital, supra,* 191 *N.J.* at 141, 922 *A.*2d 731, the Court held that there was "no statutory provision with which the regulations [at issue] are expressly inconsistent." It found, quoting *SMB Assocs., supra,* and citing *In re CAFRA, supra,* that waivers of regulatory requirements generally must be embodied in a regulation, adopted pursuant to the APA. *Id.* at 143, 922 *A.*2d 731. The Court further declared that "administrative action cannot be arbitrary or capricious or inconsistent with the legislative intent, policy, or delegation of authority." *Id.* at 143–44, 922 *A.*2d 731.

Recently, in deciding whether a resolution and guidance document by the Council on Affordable Housing (COAH) waiving parts of its revised third round rules constituted an amendment to those rules that was required to be adopted in conformity with the APA, this court in *In re Highlands Master Plan,* 421 *N.J.Super.* 614, 632–33, 25 *A.*3d 1172 (App.Div.2011) (citations omitted), declared:

> The power to waive administrative rules may be used solely to deal with the unusual circumstances of an individual regulated party. It may not be invoked to implement wholesale changes in administrative rules, as applied to a large segment of regulated parties, which circumvent the rule-making requirements of the APA.

*See also Dougherty v. Dep't of Human Servs.*, 91 *N.J.* 1, 8, n. 3, 11–12, 449 *A.*2d 1235 (1982) (recognizing the agency's "power to waive" a regulation and instructing that agency hearings "must include consideration of particular circumstances").

And, most recently in *Dragon v. New Jersey Department of Environmental Protection,* 405 *N.J.Super.* 478, 965 *A.*2d 209 (App.Div.), *certif. denied,* 199 *N.J.* 517, 973 *A.*2d 384 (2009), in invalidating DEP's use of the litigation settlement process to deviate from strict compliance with its own regulations and "to circumvent CAFRA's substantive permitting requirements," *id.* at 492, 965 *A.*2d 209, we emphasized that "[a]n agency that seeks the power to waive its substantive regulations should adopt a regulation pertaining to any such waiver and setting forth appropriate standards to govern agency decision-making[,]" *id.* at 489, 965 *A.*2d 209 (internal quotation marks omitted). In our view, such a course of formal rulemaking avoids an informal administrative process that bends the rules on a case-by-case basis, and whose lack of transparency carries the very real potential for unfettered agency discretion and the treatment of applicants in an inequitable fashion.

As these cases illustrate, an agency's authority to modify or waive its rules inheres in its obligation "to adapt to changing circumstances and conditions," *Glukowsky v. Equity One, Inc.,* 180 *N.J.* 49, 67, 848 *A.*2d 747 (2004), *cert. denied,* 543 *U.S.* 1049, 125 *S.Ct.* 864, 160 *L.Ed.*2d 770 (2005), and to be flexible "to deal justly with unanticipated as well as anticipated situations in accordance with general legislative guides," *Ward, supra,* 11 *N.J.* at 127, 93 *A.*2d 385. After all, one of the acknowledged advantages of the administrative process is its flexibility, *FCC v. Nat'l Citizens Comm. for Broadcasting,* 436 *U.S.* 775, 811, 98 *S.Ct.* 2096, 2120, 56 *L.Ed.*2d 697, 724 (1978), to address unusual circumstances, such as public emergencies, undue hardship or conflicts between regula-

tions, *SEC v. Chenery Corp.*, 332 *U.S.* 194, 201–02, 67 *S.Ct.* 1575, 1580, 91 *L.Ed.* 1995, 2002, *reh'g denied,* 332 *U.S.* 783, 68 *S.Ct.* 26, 92 *L.Ed.* 367 (1947).

We do not ascribe dispositive significance to the fact that the Legislature has not explicitly granted DEP a "general" power to waive its own regulations. We view that authority as otherwise *implicit* in the Legislature's delegation of broad rule-making power to the agency. It is beyond cavil that an agency's "authority encompasses all express *and implied powers* necessary to fulfill the legislative scheme that the agency has been entrusted to administer." *In re Virtua–West Jersey Hosp., supra,* 194 *N.J.* at 422–23, 945 *A.*2d 692 (emphasis added); *see also N.J. League of Municipalities v. Dep't of Comm. Affairs,* 158 *N.J.* 211, 223, 729 *A.*2d 21 (1999). In addition, "the absence of an express statutory authorization in the enabling legislation will not preclude administrative agency action where, by reasonable implication, that action can be said to promote or advance the policies and findings that served as the driving force for the enactment of the legislation." *A.A. Mastrangelo, Inc., supra,* 90 *N.J.* at 683–84, 449 *A.*2d 516; *see also E.I. du Pont de Nemours & Co. v. State, Dep't of Envtl. Prot. & Energy,* 283 *N.J.Super.* 331, 346, 661 *A.*2d 1314 (App.Div. 1995). For instance, no one can seriously question DEP's implied authority to waive one environmental regulation when it is in direct and irreconcilable conflict with another regulation applicable to that particular scope or location of development; otherwise, the agency's action in applying the regulations would be arbitrary. *See N.J.S.A.* 52:14B–22. Thus, we readily imply such "incidental powers as are necessary to effectuate fully the legislative intent." *N.J. League of Municipalities, supra,* 158 *N.J.* at 223, 729 *A.*2d 21.

We similarly reject appellants' argument that the Legislature's inclusion of waiver authority in some environmental statutes signals an intentional exclusion in all others. In the first place, those statutory provisions that specifically address waivers generally either limit DEP's authority by mandating that it grant certain

waivers [10] or permit waivers of *statutory* mandates.[11] Neither, however, suggests a legislative intent to preclude waivers of rules within DEP's discretion where, as here, these waivers do not conflict with any statutory requirement. And, particularly where the waiver exemption is from a *statutory*, rather than a regulatory requirement, the need for express legislative explication is apparent. In any event, no court has suggested that express regulatory authority in one statute demonstrates a lack of implied authority elsewhere.

For all these reasons, we conclude that DEP did not act ultra vires in promulgating its comprehensive set of general waiver

---

[10] For example, the Flood Hazard Area Control Act, *N.J.S.A.* 58:16A–50 to –66, grants DEP broad authority to adopt rules regulating development in delineated floodways, but limits that authority by mandating that "[p]rovision shall be made ... for the waiver ... of strict compliance with the rules and regulations, where necessary to alleviate hardship." *N.J.S.A.* 58:16A–55(b).

Similarly, the Brownfield and Contaminated Site Remediation Act, *N.J.S.A.* 58:10B–1.1 to –31, mandates that DEP establish "minimum remediation standards that are risk based," *N.J.S.A.* 58:10B–2.1, but then limits DEP's authority by requiring that DEP rules "shall provide" for waivers. *N.J.S.A.* 58:10B–2(b).

[11] For example, the Highlands Water Protection and Planning Act, *N.J.S.A.* 13:20–1 to –35, provides a variety of "prohibitions," "requirements," and other mandates in establishing environmental standards for the Highlands preservation area, *N.J.S.A.* 13:20–32(a) to (k), but then mandates that DEP rules "shall include" provisions allowing waivers therefrom if determined to be necessary to protect the public health and safety, to permit redevelopment in certain previously developed areas, or to avoid the taking of property without just compensation. *N.J.S.A.* 13:20–33(b)(1)–(3).

Similarly, CAFRA grants DEP authority to waive its statutory permit requirements "for any development that involves the grading or excavation of a dune by a governmental agency if the commissioner finds that such a waiver is warranted as a result of a storm, natural disaster or similar act of God." *N.J.S.A.* 13:19–5.3.

Lastly, by way of example, the Freshwater Wetlands Protection Act, *N.J.S.A.* 13:9B–1 to –30, mandates certain buffers, known as "transition areas," around freshwater wetlands, *N.J.S.A.* 13:9B–17, and then mandates that DEP "shall grant a transition area waiver" in certain circumstances. *N.J.S.A.* 13:9B–18(a); *N.J.S.A.* 13:9B–12.

rules, *N.J.A.C.* 7:1B–1 to –2.4. This promulgation constituted a valid exercise of DEP's implied authority incidental to the extensive and expressly broad powers vested in the agency by the Legislature. Simply stated, the power to promulgate a regulation implies the incidental authority to suspend or waive its application in certain limited, well-defined circumstances provided such exemption does not circumvent any legislative enactment or purpose, or federal law, is consistent with the agency's statutory core mission and objectives, is accomplished through a properly adopted regulation pursuant to the APA, and establishes appropriate and clear standards for the exercise of agency discretion—all qualifications and prerequisites that we next address.

## III

Alternatively, appellants argue that even if the waiver rules fall within the scope of DEP's legislative authority, they nevertheless lack adequate regulatory standards to guide the discharge of agency discretion thereunder. DEP counters that the rules identify situations where waivers may be appropriate, incorporate readily ascertainable standards routinely used by the agency to administer its existing regulatory programs, and explicitly prohibit waivers from thirteen categories of existing regulations.

It is well-settled that a rule that does not contain a clear or objectively ascertainable standard may not be upheld. *In re Review of Admin. Promulgation of Health Care Admin. Bd.: N.J.A.C. 8:30–14.1 Through 8:30–14.6,* 83 *N.J.* 67, 82, 415 *A.*2d 1147, *appeal dismissed* and *cert. denied sub nom. Wayne Haven Nursing Home v. Finley,* 449 *U.S.* 944, 101 *S.Ct.* 342, 66 *L.Ed.*2d 208 (1980). A regulation will be invalidated if it fails " 'to provide ... regulatory standards that would inform the public and guide the agency in discharging its authorized function.' " *N.J. Soc'y for the Prevention of Cruelty to Animals, supra,* 196 *N.J.* at 386, 955 *A.*2d 886 (quoting *Lower Main St. Assocs. v. N.J. Hous. & Mortgage Fin. Agency,* 114 *N.J.* 226, 235, 553 *A.*2d 798 (1989)).

Our role therefore is "to assure that agency rulemaking conforms with basic tenets of due process, and provides standards to guide both the regulator and the regulated." *Lower Main St. Assocs., supra,* 114 *N.J.* at 236, 553 *A.*2d 798.

Nevertheless, when regulatory standards are provided, our courts have found that the regulations must only be "sufficiently definite to inform those subject to them as to what is required." *In re Review of Admin. Promulgation, supra,* 83 *N.J.* at 82, 415 *A.*2d 1147. "[R]egulations must be flexible enough to accommodate the day-to-day changes in the area regulated." *Ibid.*

The waiver rules at issue here make clear that they will be applied only in limited circumstances where an applicant establishes that it meets one of the four bases for consideration of a waiver request and demonstrates the compelling circumstances needed to satisfy the rule's criteria: namely, public emergencies, conflicts between regulations, undue hardship or production of a net environmental benefit, *N.J.A.C.* 7:1B–2.1(a). Appellants take issue with three of these criteria, arguing that they are vague and ill-defined.

Appellants first contend that the waiver rules fail to provide a method for calculating a "net environmental benefit." Specifically, they argue that DEP has provided "no formula" to determine how it will measure that benefit or the harm that might occur as a result of a given waiver, or how to weigh those two measurements. We disagree.

"There are some concepts which, by their nature, defy precise definition." *In re Revocation of Access of Block No.1901, Lot No. 1, Borough of Paramus,* 324 *N.J.Super.* 322, 332, 735 *A.*2d 594 (App.Div.), *certif. denied sub nom. In re Access of Block #1901 (Parkway 17 Assocs.),* 162 *N.J.* 664, 745 *A.*2d 1213 (1999). We consider "net environmental benefit" to be one of those concepts.

Even so, the regulatory definition of "net environmental benefit," *N.J.A.C.* 7:1B–1.2, articulates some criteria and generally describes an evaluative process of weighing both the qualitative

and quantitative components of environmental benefits and detriments in light of the particular circumstances, resources, and activities involved. "[W]here a regulation does provide some standards or criteria, a substantial degree of discretion allows the agency the flexibility to deal with the varying circumstances." *In re Crown/Vista Energy Project Boiler Stack No. 1, Log 01–92–0857*, 279 *N.J.Super.* 74, 84, 652 *A.*2d 212 (App.Div.), *certif. denied*, 140 *N.J.* 277, 658 *A.*2d 301 (1995). Moreover, because the Commissioner necessarily will have to "articulate the standards and principles that govern [his] discretionary decisions in as much detail as possible," *Van Holten Grp. v. Elizabethtown Water Co.*, 121 *N.J.* 48, 67, 577 *A.*2d 829 (1990) (internal quotation marks omitted), applicants and other parties with discernible interests will be able to challenge his waiver decisions and weighing of environmental benefits and harms.

Appellants find similar fault with the "conflicts" and "unduly burdensome" criteria. As noted, the waiver rules authorize DEP to waive a regulation when there are "[c]onflicting rules," *N.J.A.C.* 7:1B–2.1(a)(1), which DEP defines as "a situation in which two or more Department rules, or a Department rule and the rule of another State agency or a Federal agency, conflict so as to make compliance with both rules impossible or impracticable[,]" *N.J.A.C.* 7:1B–1.2. And the rules also authorize DEP to waive a regulation when "[t]he strict compliance with the rule would be unduly burdensome," *N.J.A.C.* 7:1B–2.1(a)(2), which is defined as involving either "exceptional hardship" or "excessive cost in relation to an alternative measure of compliance that achieves comparable or greater benefits to public health and safety of the environment[,]" *N.J.A.C.* 7:1B–1.2.

In our view, the definition of "conflicting rules" is neither vague nor, as appellants argue, an "invitation to arbitrary decision-making." Whether or not the conflict between rules is facial or based upon express language, the waiver applicant must demonstrate a conflict as applied to a specific person, project, or property. Likewise, although the definition of "unduly burdensome" is

rather broad, it nevertheless contains some standards, and language any more rigid may impede DEP's discretion and flexibility to review waiver applications. Significantly, with respect to all three of the challenged criteria or bases, the waiver rules incorporate regulatory standards that are routinely used by DEP to administer its various environmental programs, have been part of existing regulations whose validity has been uncontested and uncontroversial, and are thus presumed to be understood by the regulated community.[12]

Moreover, the four bases upon which regulatory waiver relief may be predicated are further qualified and defined by the waiver evaluation criteria contained in *N.J.A.C.* 7:1B–2.2., the most significant of which requires the waiver to be consistent with DEP's core missions to maintain, protect, and enhance the State's natural resources, and to protect public health, safety, and welfare, and the environment. *N.J.A.C.* 7:1B–2.2(a)(6).[13] And even further delimiting is the fact that the waiver rules contain over a dozen explicit statutory categories where the corresponding regulations cannot be waived, *N.J.A.C.* 7:1B–2.1(b), the most significant of which expressly prohibits the waiver of any substantive or procedural requirements expressed in a federal or a state statute,

---

[12] For example, the Flood Hazard Area Control Act regulations allow for permit waivers where the "applicant clearly demonstrates that compliance with [the relevant section] is not possible or feasible, and/or that the cost of compliance greatly outweighs the environmental benefit that would be achieved." *N.J.A.C.* 7:13–11.7(m)(1).

[13] We recognize that the parties and the amici differ in their respective conceptions of DEP's "core missions," and about the extent to which those missions can properly take into account, if ever, business and economic interests. We need not resolve those differences in the present appeal, which was brought as a facial challenge to the new waiver regulations. Because the policies and objectives of each statute within DEP's authority vary, it makes little sense to analyze the agency's core missions here in the abstract. Instead, we defer such context-based questions about the substance and the implementation of DEP's core missions within a particular statutory scheme or program to potential future "as applied" litigation involving discrete agency decisions granting or denying a waiver application.

*N.J.A.C.* 7:1B–2.1(b)(1); consequently, they do not amend, enlarge, alter, limit or circumvent any direct legislative pronouncement.

Lastly, appellants argue that the waiver rules do not expressly require, as another criterion, the waiver to be *consistent* with all applicable statutory requirements and criticize DEP's deletion of a proposed provision expressing such a requirement before formal adoption of the rules. *See* 43 *N.J.R.* 478.[14] We do not view this omission as fatal to the validity of the waiver rules inasmuch as this consideration is otherwise implicit therein.

As noted, *N.J.A.C.* 7:1B–2.1(b) lists those agency regulations that cannot be waived under the waiver rules. Thus, weighing the consistency of an activity that would be authorized by a waiver with the purposes and objectives of statutory requirements is rendered unnecessary by the prohibition in *N.J.A.C.* 7:1B–2.1(b)(1) against the issuance of a waiver under these rules of any requirement or duty imposed by federal statute or regulation or by State statute unless the statute or regulation specifically provides for a waiver. Furthermore, as noted, DEP must consider under *N.J.A.C.* 7:1B–2.2(6), whether the waiver would be consistent with DEP's "core missions" to maintain, protect, and enhance the State's natural resources and to protect public health, safety, and welfare, and the environment.

In sum, we conclude that the waiver rules contain adequate regulatory standards that guide DEP in deciding waiver applications.

---

[14] The proposed *N.J.A.C.* 7:1B–2.2(a)(6) read in pertinent part:

7:1B–2.2 Waiver evaluation criteria

(a) The Department shall consider the extent to which the following criteria support a waiver of the strict compliance with a rule in accordance with this chapter:

. . . .

6. *The activity authorized by the waiver would be consistent with the purposes and objectives of all applicable statutory requirements;*
[43 *N.J.R.* 478 (emphasis added).]

## IV

██ We agree with appellants, however, that DEP has engaged in *de facto* rulemaking in violation of the APA's notice and comment requirements by posting on its website, after promulgation of the waiver rules, so-called "guidance" documents and FAQs. These postings collectively detail DEP's plans to develop internal processes and procedures to ensure consistency in its waiver decision-making, to create a priority system for its consideration of waiver requests, to expand transparency in noticing the receipt of applications for waivers, and to develop standardized submission forms. By explaining the waiver rules and describing what DEP will require applicants to submit to satisfy the waiver rules and receive a waiver grant, these postings go beyond merely facilitating administrative implementation of the rules as claimed by DEP and actually, to some extent, announce new substantive requirements, necessitating compliance with the APA.

The inquiry whether an agency's actions constitute improper rulemaking is informed by well-settled principles. In the first place, and as already noted, agency action is presumed valid and a challenger bears the burden of rebutting that presumption. *Gloucester Cnty. Welfare Bd. v. State Civil Serv. Comm'n,* 93 *N.J.* 384, 390, 461 *A.*2d 575 (1983); *In re Proposed Xanadu Redevelopment Project,* 402 *N.J.Super.* 607, 632, 955 *A.*2d 976 (App.Div.), *certif. denied,* 197 *N.J.* 260, 962 *A.*2d 530 (2008). "[I]t is within the agency's discretion 'to select those procedures most appropriate to enable the agency to implement legislative policy[,]' " so long as the action is consistent with "due process" and the APA. *In re Request for Solid Waste Util. Customer Lists,* 106 *N.J.* 508, 519–20, 524 *A.*2d 386 (1987) (quoting *Texter v. Human Servs. Dep't,* 88 *N.J.* 376, 385, 443 *A.*2d 178 (1982)). Thus, the discretion to act formally or informally is not absolute. *Airwork Serv. Div. v. Dir., Div. of Taxation,* 97 *N.J.* 290, 303–04, 478 *A.*2d 729 (1984), *cert. denied,* 471 *U.S.* 1127, 105 *S.Ct.* 2662, 86 *L.Ed.*2d 278 (1985).

██ Where the APA does not require rulemaking, an agency may act informally. *In re Request for Solid Waste Util. Customer*

*Lists, supra,* 106 *N.J.* at 518, 524 *A.*2d 386. Permissible "informal agency action includes investigating, publicizing, planning, and supervising a regulated industry." *Id.* at 519, 524 *A.*2d 386.

 Formal rulemaking, on the other hand, "allows the agency to further the policy goals of legislation by developing coherent and rational codes of conduct 'so those concerned may know in advance all the rules of the game, so to speak, and may act with reasonable assurance.'" *Gen. Assembly of N.J. v. Byrne,* 90 *N.J.* 376, 385–86, 448 *A.*2d 438 (1982) (quoting *Boller Beverages, Inc. v. Davis,* 38 *N.J.* 138, 152, 183 *A.*2d 64 (1962)). "The procedural requirements for the passage of rules are related to the underlying need for general fairness and decisional soundness that should surround the ultimate agency determination." *Metromedia Inc. v. Dir., Div. of Taxation,* 97 *N.J.* 313, 331, 478 *A.*2d 742 (1984).

The APA defines an administrative rule as "each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency." *N.J.S.A.* 52:14B–2(e). "If an agency determination or action constitutes an 'administrative rule,' then its validity requires compliance with the specific procedures of the APA that control the promulgation of rules." *Airwork, supra,* 97 *N.J.* at 300, 478 *A.*2d 729.

*Metromedia* identified six factors that should be considered when evaluating whether an agency determination, "to be valid, had to comply with the requirements governing the promulgation of administrative rules as provided by the APA[.]" 97 *N.J.* at 328, 478 *A.*2d 742. They are:

[Whether it] (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject

matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

[*Id.* at 331–32, 478 *A.*2d 742.]

*See also In re Highlands Master Plan,* 421 *N.J.Super.* 614, 630–31, 25 *A.*3d 1172 (App.Div.2011).

Although these criteria were formulated by the Court in a context that distinguished rulemaking from adjudication, they also provide a test of when rulemaking procedures are necessary in order to validate agency actions or determinations. *Woodland Private Study Grp. v. State, Dep't of Envtl. Prot.,* 109 *N.J.* 62, 68, 533 *A.*2d 387 (1987). In fact, these "factors are relevant whenever the authority of an agency to act without conforming to the formal rulemaking requirements is questioned." *Doe v. Poritz,* 142 *N.J.* 1, 97, 662 *A.*2d 367 (1995). And they "need not be given the same weight, and some factors will clearly be more relevant in a given situation than others." *Ibid.*

We recently invalidated a "Guidance" document promulgated by an administrative agency. In *In re Adoption of Regional Affordable Housing Development Program Guidelines,* 418 *N.J.Super.* 387, 391–95, 13 *A.*3d 900 (App.Div.2011), we concluded that the "Regional Affordable Housing Development Program Guidelines" issued by COAH set forth standards amounting to rules that should have been adopted in accordance with the APA's rulemaking procedures. And in *In re Highlands Master Plan, supra,* 421 *N.J.Super.* at 629–33, 25 *A.*3d 1172 we invalidated another "Guidance" document as *de facto* rulemaking in violation of the APA.

Here, DEP explained in its responses to commenters during the promulgation process:

> There are two primary reasons the Department did not include detailed procedural requirements for waiver applications in the rules. First, most waiver applicants will also require other Department approvals and so must follow the application procedures to obtain those approvals under the applicable program rules. A waiver application in the context of applying for another approval would most likely need to contain information compare-able to that necessary for the application for the particular approval. Second, these rules will apply to a wide variety of situations. In each case, reviewing the four requisite bases at *N.J.A.C.* 7:1B–2.1(a) for consideration of a waiver and the waiver evaluation criteria in the

rules, the applicant will know what types of documentation will serve to demonstrate how waiver of a particular rule provision applicable to a particular activity in the applicant's case will meet the requirements for a waiver under the rules. If the Department does not receive sufficient information and data to support a waiver under these waiver rules, or if it does not receive such information in a timely manner, the waiver request will be denied.

[44 *N.J.R.* 1017.]

Nevertheless, DEP declared that it

will also be posting on its website information regarding the implementation of the waiver rules and other information regarding waiver decisions pursuant to these rules. . . .

The Department is developing an internal review process to ensure consistency in the Department's future review and disposition of waiver applications pursuant to these rules. The Department believes that this process, coupled with the substantive standards, decision-making criteria, and limitations in the rules and the posting of notice of waiver decisions and information pursuant to these rules, will result in coherent, principled, and consistent consideration and disposition of waiver applications.

[44 *N.J.R.* 994–95.]

For example, in DEP's "Guidance Document For Requests Pursuant to *N.J.A.C.* 7:1B," DEP lists specific procedures and instructions that waiver applicants should follow to prove and satisfy each of the four bases for waivers under *N.J.A.C.* 7:1B–2.1(a). One such listing reads:

*Unduly Burdensome*

The Unduly Burdensome definition contains two separate and distinct provisions that an applicant can request a waiver under. An applicant may provide information for one, or both, provisions as part of a waiver request.

For all Unduly Burdensome requests, if the underlying program rules for which a waiver is being sought contains a waiver, variance, or exemption provision, the applicant requesting a waiver on the Unduly Burdensome basis should explain the reasons for not availing itself of such existing provisions.

1. *Actual, exceptional hardship for a particular project, or activity, or property*

• A statement detailing how the circumstances give rise to an exceptional hardship and how a waiver request will alleviate this hardship. For example, the specific circumstances an applicant may identify include, but are not limited to:

 • Exceptional topographic, physical, or chemical conditions or features uniquely affecting a specific piece of property, or structures thereon; or

 • An extraordinary and exceptional situation uniquely affecting a specific piece of property, or structures existing thereon; or

 • Technical impracticability of treatment technologies for the particular project, activity, or property; or

- Temporal or other non-physical characteristics unique to the particular project, activity, or property; or

- Other unique circumstances associated with the particular project, activity, or property

*2. Excessive cost in relation to an alternative measure of compliance that achieves comparable or greater benefits to public health and safety or the environment*

- A statement of specific facts supporting an alternative measure:

 - An explanation of the benefit to public health and safety or the environment of strict compliance of the rules sought to be waived; and

 - A description of the alternative measure; and

 - An explanation of the benefit to public health and safety or the environment of the alternative measure of compliance; and[ ]

 - A discussion comparing how the alternative measure of compliance provides comparable or greater benefit to public health and safety, or the environment than strict compliance with the rule sought to be waived

- A statement of specific facts detailing costs of compliance

 - Detail the expected cost of strict compliance with the rule sought to be waived; and

 - Detail the expected cost of the alternative measure of compliance with the rule sought to be waived, including any costs or benefits to potentially affected individuals or community; and

 - A discussion comparing the costs of strict compliance and the alternative measure of compliance

The other listings in that guidance document are similar in scope and detail of instructions. Also, the document explains the various evaluation criteria and identifies other reports and documents an applicant should consider supplying to DEP.

In our view, all six of the *Metromedia* factors apply to the guidance documents and to much of DEP's website here. The information posted is intended to have wide coverage, applying not only to all persons seeking a waiver of DEP's regulations, but to the entire regulated community and the public in general. Moreover, it is drafted so as to be applied generally and uniformly for all future waiver applications. Factors four and five of *Metromedia* especially are key, because this information prescribes procedures, agency policies, and directives concerning application submissions and evaluations that are not otherwise expressly provided

by or obviously inferable from the waiver rules themselves or from any statute or other regulation.

In fact, despite DEP's attempts to validate each of its online documents, nowhere in the waiver rules does the agency explain what specific materials should be submitted with a waiver application, what materials it will consider for application completion or waiver approval, or how it will conduct its review. Furthermore, since the waiver rules have universal and comprehensive application to many of DEP's independent regulatory schemes, we are simply unpersuaded by DEP's claims that it is only requiring what applicants seeking to waive regulation in those schemes already need to submit. That is, the existing standards and procedures in each statutory scheme. Administrative agency action and an agency's discretionary choice of the procedural mode of action are valid only when there is compliance with the APA. *Nw. Covenant Med. Ctr. v. Fishman*, 167 *N.J.* 123, 137, 770 *A.*2d 233 (2001).

Simply put, as DEP's own explanation makes clear, these postings do more than implement the waiver rule; they establish rules of the game. By elaborating upon and clarifying the very standards by which applicants will be held and the outcomes of their applications determined, these newly posted measures will have a substantial impact on the regulated community as well as the public in general. As such, they form integral, substantive components of the waiver rules, subject to rulemaking in accordance with the APA.

In this regard, DEP's plans to develop so-called "internal" processes to ensure consistency of decision-making, prioritization of applications, transparency of review and standardization of forms provide the missing links in the waiver rules' four predicate bases for relief and their accompanying "evaluation criteria." These processes carry the very real potential to determine when an application will be considered and when a waiver will be granted or denied.

For instance, a process that ensures consistency of result is not exclusively "internal" but necessarily sets the external criteria by

which the agency decides when a conflict of rules becomes "impracticable," or a cost, unduly "excessive," or the limits of its definition of "net environmental benefit" have been reached. These standards, in turn, establish "the essential quality of fairly predictable decisions," *Boller Beverages, Inc., supra,* 38 *N.J.* at 152, 183 *A.*2d 64, and therefore must be the product of rulemaking.

This same reasoning equally applies to DEP's development of standardized submission forms. Although they may not directly impact the substantive rights of the regulated community or the public at large, these forms nevertheless will fill in the interstitial gaps in the waiver rules that nowhere detail the type, nature, scope, or amount of evidence required to decide a waiver application. These missing links, we conclude, must be developed by DEP through notice and comment rulemaking.

Finally, like appellants, we remain unconvinced by DEP's attempt to rehabilitate its web postings created after promulgating the rules by asserting additional explanations in its brief. An appellate brief is no place for an agency to try and rehabilitate its actions. *In re Petition of Elizabethtown Water Co. for an Increase in Rates,* 107 *N.J.* 440, 460, 527 *A.*2d 354 (1987) (agency orders not judged on "after-the-fact" documents "purporting to explain" actions taken) (citing *Sec. & Exch. Comm'n v. Chenery Corp.,* 318 *U.S.* 80, 87, 63 *S.Ct.* 454, 459, 87 *L.Ed.* 626, 633 (1943)).

We emphasize, however, that DEP's lack of an adequately promulgated internal review process does not fatally flaw the entire waiver regulatory scheme. On this score, we reiterate our view that there are sufficient substantive standards in the waiver rules for applicants to submit, and the decision-maker to evaluate, waiver applications. The rules set forth a statement of purpose emphasizing that waivers shall be consistent with DEP's core missions, *N.J.A.C.* 7:1B–1.1(a), establish that only four limited situations, or bases, will be considered to grant a waiver, *N.J.A.C.* 7:1B–2.1(a), and provide detailed criteria that must be applied by the final decision-maker in his or her review and evaluation of

waiver applications, *N.J.A.C.* 7:1B–2.2(a). The rules also impose limitations curbing the discretion to grant any waiver application, *N.J.A.C.* 7:1B–2.1(b) and 2.4. Thus, even without the guidance documents and FAQs listed on DEP's website, the waiver rules provide adequate standards and safeguards to inform the public and guide the agency as to how decisions will be made under the new rules.

Accordingly, we uphold DEP's authority to promulgate waiver rules and affirm the waiver rules, as written and adopted. We invalidate the documents on DEP's website, to the extent they go beyond the terms of the regulations themselves, as *de facto* rulemaking without APA compliance.