NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4880-11T2
A-4883-11T2

PINELANDS PRESERVATION ALLIANCE
and MICHAEL PERLMUTTER,

    Appellants,

v.

STATE OF NEW JERSEY DEPARTMENT
OF ENVIRONMENTAL PROTECTION and
JAYLIN HOLDINGS, LLC,

    Respondents.

_____

IN THE MATTER OF THE DEPARTMENT
OF LAND USE REGULATION ISSUANCE
OF PERMIT NOS. 1500-04-0001.1,
APL080001, FWW090001.

_____

<table>
<tr><td>APPROVED FOR PUBLICATION<br><br>June 3, 2014<br><br>APPELLATE DIVISION</td></tr>
</table>

Argued March 24, 2014 - Decided June 3, 2014

Before Judges Parrillo, Harris, and
Guadagno.

On appeal from the New Jersey Department of
Environmental Protection, Permit Nos. 1500-
04-0001.1, APL080001, FWW090001.

Ronald S. Gasiorowski argued the cause for
appellants Pinelands Preservation Alliance
and Michael Perlmutter (A-4880-11)
(Gasiorowski & Holobinko, attorneys; Mr.
Gasiorowski and Christie A. Gasiorowski, on
the briefs).

Aaron Kleinbaum argued the cause for
appellants New Jersey Conservation

Foundation, American Littoral Society, Sierra Club – New Jersey Chapter, and Save Barnegat Bay (A-4883-11) (Eastern Environmental Law Center, attorneys; Mr. Kleinbaum, of counsel and on the briefs; Alice R. Baker, on the briefs).

William F. Harrison argued the cause for respondent Jaylin Holdings, LLC (No. A-4880-11) (Genova, Burns, Giantomasi, Webster, LLC, attorneys; Mr. Harrison, of counsel; Cynthia L.M. Holland and Erin K. Phalon, on the brief).

Lewin J. Weyl, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection in (A-4880-11 and A-4883-11) (John J. Hoffman, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Jung W. Kim, Deputy Attorney General, on the briefs).

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

In these back-to-back appeals, which we have consolidated for purpose of this opinion, a coalition of environmental interest groups[1] and local interested parties[2] challenge a permit granted by the New Jersey Department of Environmental Protection (DEP) to respondent, Jaylin Holdings, LLC (Jaylin), under the Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1 to

---

[1] New Jersey Conservation Foundation, American Littoral Society, Sierra Club – New Jersey Chapter, and Save Barnegat Bay (A-4883-11) (collectively EELC or Eastern Environmental Law Center).

[2] The Pinelands Preservation Alliance (PPA) and Michael Perlmutter (A-4880-11).

-21,[3] allowing the construction of a Walmart retail store and related improvements on property Jaylin owns that straddles Toms River Township[4] and Manchester Township in Ocean County.

Appellants argue that DEP: (1) improperly waived compliance with its coastal regulations by allowing Jaylin to mitigate any adverse development impacts by using off-site parcels and to use expired impervious cover limits; (2) violated the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -25, by creating a new habitat assessment methodology without proper rulemaking; (3) ignored the requirements of the Pinelands Protection Act, N.J.S.A. 13:18A-1 to -29, and the Pinelands Comprehensive Management Plan (CMP) Rules, N.J.A.C. 7:50-1.1 to -10.35; and (4) allowed inadequate notice to owners near the off-site mitigation parcels.

By way of background, on November 8, 2004, Jaylin submitted an application to DEP's Division of Land Use Regulation (DLUR) requesting a CAFRA individual permit, a stream encroachment permit, and a transition area waiver under the Freshwater

---

[3] Also calendared back-to-back with the present appeals are parallel actions challenging the validity of Jaylin's municipal approvals: Perlmutter v. Township of Toms River Planning Bd., Docket No. A-2814-11, and Perlmutter v. Jaylin Holdings, LLC, Docket No. A-2958-12; and a related action, Jaylin Holdings, LLC v. Perlmutter, Docket No. A-5958-12.

[4] The Township of Toms River was known as Dover Township until November 14, 2006.

Wetlands Protection Act (FWPA), <u>N.J.S.A.</u> 13:9B-1 to -30.[5]  Jaylin proposed developing its forty-three acre property by constructing a 203,091 square foot Walmart retail store, a 19,884 square foot garden center, 1049 parking spaces, three stormwater basins and access roads, while reserving two outparcels for future use.

Approximately 17.13 acres of the proposed construction site are located in Toms River Township, and approximately 25.87 acres are located in Manchester Township.  With the exception of a gas station, the construction site is undeveloped and mostly forested; wetlands are located at the southern end.

The site is located in the coastal zone of the Pinelands National Reserve, and it is bordered by Route 37 to the north; by Northampton Boulevard to the east; by approximately 7300 acres of undeveloped land to the west, which is owned by Heritage Minerals, Inc., and which was previously disturbed by sand mining operations; and by a Conrail right-of-way to the south.  There is dense residential development north of Route 37, the Toms River Industrial Park east of Northampton Boulevard, more undeveloped land south of the Conrail right-of-

---

[5] At Jaylin's request, DLUR determined in May 2004 that there were freshwater wetlands of intermediate resource value on and adjacent to the proposed activity, requiring a transition area or buffer of fifty feet.

way and an extensive residential development southeast of the right-of-way.

DEP published notice of Jaylin's 2004 application in the DEP Bulletin on December 29, 2004, and Jaylin provided notice to the municipal entities and to the surrounding property owners. On January 27, 2005, DLUR deemed the application complete for final review.

In March 2005, DEP's Division of Fish and Wildlife (DFW) voiced concerns that Jaylin's project would not comply with N.J.A.C. 7:7E-3.38(b), governing endangered or threatened species habitat in the coastal zone, because of the property's proximity to past sightings of the northern pine snake. In Summer 2005, Jaylin's consultant saw northern pine snakes and evidence of pine snake hibernacula on the property. Two adult males were discovered, captured, implanted with radio transmitters and monitored until they settled into their winter hibernacula. One snake wintered on the property; the other snake wintered on the neighboring Heritage Minerals property.

The northern pine snake is listed as a "threatened" species in New Jersey. N.J.A.C. 7:25-4.17 (list providing conservation status of New Jersey's indigenous nongame wildlife species). According to the habitat impact assessment prepared by Jaylin's experts, they are long-lived, large-bodied, non-venomous

"constrictors that forage aboveground or in subterranean rodent burrows." DEP's "Status Assessment of the Northern Pine Snake[,]" published in December 2009, notes that their numbers are unknown, and they are "found nowhere else in the world but along a narrow fringe of pinelands habitat that occurs within the eastern [United States]." They isolate themselves from other snakes and even from other pine snake populations. They nest in open areas with loose sandy soils and follow scent trails to overwinter in unique underground hibernacula, beginning in early to mid-October and ending in April. They have specific habitat needs and, according to DEP's report, are "less flexible with [their] ability to use various habitat types."

On June 1, 2006, DLUR denied Jaylin's entire 2004 application, finding noncompliance with, among other regulations, N.J.A.C. 7:7E-3.38, governing endangered or threatened wildlife or plant species habitats.

On June 5, 2006, Jaylin appealed the denial to DEP's Office of Legal Affairs (OLA), requesting an adjudicatory or contested case hearing before the Office of Administrative Law (OAL), N.J.A.C. 7:7-5.1(a), or alternative dispute resolution (ADR) before DEP's Office of Dispute Resolution (ODR), N.J.A.C. 7:7-5.4(a) and N.J.A.C. 7:7A-1.7(e). Initially, on December 8,

2006, the ODR rejected ADR as not appropriate, because no mitigation alternative was available for endangered or threatened species.[6] Nonetheless, for reasons not apparent in the record, various DEP divisions and Jaylin engaged in formal ADR but "were unable to reach an agreement" as of September 2007. The ODR told the OLA to transmit the matter to the OAL "for an adjudicatory hearing." However, informal discussions between DLUR and Jaylin continued, resulting in a modified project design.

On July 2, 2009, Jaylin participated with DLUR in a "non-binding" "pre-application conference." DLUR's Assistant Director "noted that the anticipated application would be a new application and would be reviewed under the revised design and the current regulations."

On October 22, 2009, Jaylin submitted an application to DLUR requesting a CAFRA individual permit and a FWPA general permit.[7] Reducing the scale of its project, Jaylin proposed constructing an 187,793 square foot retail store, a 5703 square

---

[6] The ODR wrote: "The DFW has determined that an adverse impact to T&E [threatened and endangered species] habitat will occur if the project is built, and New Jersey's Coastal Zone Management Rule for Endangered or Threatened Wildlife or Plant Species habitats does not contemplate mitigation since adverse impacts are specifically prohibited."

[7] DEP ultimately granted Jaylin's request for a FWPA general permit, and appellants do not appeal that approval.

foot garden center, 833 parking spaces, five above-ground and two underground stormwater basins and access roads. Jaylin also proposed shifting its project more onto the Toms River Township portion of the property and away from the existing snake hibernaculum and proposed building a four-foot high linear barrier wall to separate the hibernaculum from the development. Jaylin's counsel characterized the application as "a resubmission[,]" which "represents a significantly revised and reduced project that is proposed as a result of the 2006 denial."

In addition to its project activities, Jaylin proposed purchasing, enhancing, and preserving by dedication to DEP two properties in Manchester Township to mitigate any pine snake habitat disturbance on the construction site: (1) a 21 acre parcel that abutted the southwestern portion of the construction site and would serve as a corridor linking the on-site habitat to other habitats across the Conrail right-of-way; and (2) an 89.29 acre parcel that was not near Jaylin's property, but was adjacent to two mapped existing regional wildlife management areas containing documented northern pine snake habitat. Habitat enhancements on the two properties would include construction of artificial hibernacula and stump/debris piles, selective tree thinning, blocked access, creation of upland

forest clearings for nesting and scarifying the ground to benefit existing pine snake habitat.

DEP published notice of the application in the DEP Bulletin on November 18, 2009 and notice of a thirty-day public comment period in the DEP Bulletin on December 16, 2009. Jaylin provided notice to the municipal entities and to the surrounding property owners.

On March 15, 2010, DLUR denied Jaylin's 2009 application request for a CAFRA individual permit, finding noncompliance with, among other regulations, the same regulation that formed the basis of the agency's 2006 denial, namely N.J.A.C. 7:7E-3.38, concerning endangered or threatened wildlife or plant species habitats, as well as N.J.A.C. 7:7E-5B.4, -5B.5 and -5B.6, concerning impervious cover limits and mainland coastal centers. Notice of the permit decision was published in the DEP Bulletin on March 24, 2010.

On April 23, 2010, Jaylin appealed to DEP's OLA, requesting an OAL hearing or ADR, and also offered "to negotiate a settlement." During subsequent settlement negotiations, DEP and Jaylin's consultants conducted "a joint inspection of the sites," and Jaylin offered to discuss additional mitigation

measures.[8]  To that end, on December 1, 2010, Jaylin submitted "a revised permit application" to DLUR "[i]n accordance with the provisions of N.J.A.C. 7:7-5.4, entitled Settlement in Response to a Hearing Request[.]"  Similar to its immediately preceding application, Jaylin proposed constructing an 189,797 square foot retail store with a water tower, a 5703 square foot garden center, 833 parking spaces, five above-ground and two underground stormwater basins and access roads, totaling a 22.4 acre development area.  As before, the proposed development area straddled both townships; however, most of the activities would again be confined on the Toms River Township portion.  Save for an above ground basin, part of the parking lot and part of an access road from Route 37 to be located in Manchester Township, the rest of property in that Township would be dedicated to pine snake habitat.

Jaylin also proposed constructing a 3319-foot-long, four-foot-high snake barrier wall to keep the pine snakes away from the development and proposed leaving a 150-foot buffer around the existing snake hibernaculum.  Additionally, Jaylin purchased the two additional parcels planned for habitat preservation and

[8] Meanwhile, on October 6, 2010, the Toms River Planning Board approved Jaylin's application for preliminary and final major site plan approval and various dimensional variances.  On November 1, 2010, the Manchester Planning Board approved the project.

enhancement.

To support its application, Jaylin submitted updated information and reports, including an analysis applying DEP's new Habitat Evaluation Method (HEM) for northern pine snakes to the construction site and the mitigation parcels. Jaylin's experts asserted in these documents that the proposed activities would not negatively affect the pine snake population or habitat because of the proposed mitigation measures.

DEP created the "Conceptual [HEM] for Northern Pine Snakes" in August 2010. Using this methodology, DEP's Division of Fish and Wildlife's Endangered and Nongame Species Program (ENSP) staff and Jaylin's consultants each calculated the HEM for Jaylin's proposal, arriving at "remarkably similar" numbers. That is, they compared pre- and post-development and enhancement values by estimating both the habitat value lost due to Jaylin's project and the habitat value gained by Jaylin's proposed habitat enhancements on the on- and off-site properties.

ENSP staff found that most of Jaylin's improvements to the pine snake habitat would benefit the regional pine snake population, as opposed to the snake population directly on Jaylin's construction site. Nevertheless, ENSP staff concluded that Jaylin's proposed on- and off-site enhancements would substantially improve pine snake habitats in the general area,

and the construction would result in "no net loss in habitat value" to the population.

DEP published notices of its intent to settle the permits and of the public comment period in the DEP Bulletin of January 12, 2011. Notice was also provided to the local municipalities and to all persons who had notice of the previous applications, or who had commented on them. Numerous comments were filed during the extended comment period and appellants and others submitted lengthy comments and independent expert reports.

On December 20, 2011, Jaylin and DLUR entered into a stipulation of settlement under which DEP would issue permits for the project. Jaylin was required, among other things, to set aside portions of its construction site in both Toms River and Manchester Townships, totaling 20.9 acres, where no development would occur and to maintain that portion as a "permanent conservation restriction pine snake corridor area." Jaylin also agreed to acquire and grant DEP conservation restrictions on additional parcels in Manchester Township, totaling approximately 192 acres on DEP-mapped areas with multiple pine snake habitats.

There was no requirement, however, that these acres be contiguous to the project site, contiguous to one another, near the site or even within the CAFRA area. In fact, while one

mitigation parcel of 21.1 acres is contiguous to the construction site, the other mitigation parcels are "up to 6.5 miles away."

Additionally, Jaylin agreed to install a herpetofauna fence (wire exclusion fence) on the construction site and to "retain a qualified herpetologist who shall conduct daily site inspections . . . and monitor, protect and remove to the habitat side [of the fence] all reptiles found on the construction side of the Herpetofauna Fence and on both sides of the linear barrier wall."  And Jaylin also agreed to deposit $70,911 into an escrow account for DEP "to ensure successful project completion and ongoing monitoring and maintenance of the enhanced pine snake habitat, and in a second escrow account, a refundable sum of $15,344 for the completion of the sapling planting costs[.]"

On December 21, 2011, DEP published in the DEP Bulletin a notice of settlement and of another public comment period, during which the settlement agreement was available for public inspection and review.  Numerous comments were submitted.

On April 18, 2012, DLUR issued the permit authorizing development activities within an approximate 22.4 acre portion of the original property/construction site, containing various standard, administrative and project-specific permit conditions. DLUR attached to the permit its April 2012 Environmental Report,

detailing reasons why the project met the statutory and regulatory criteria and its April 2012 Responses to Public Comments.  On May 23, 2012, DEP published notice of its final settlement and permit issuance in the DEP Bulletin.  These appeals followed.[9]

Appellants essentially complain that in granting the CAFRA permit, DEP improperly waived and failed to comply with the substantive regulations concerning endangered or threatened species habitat, N.J.A.C. 7:7E-3.38 and impervious cover limits, N.J.A.C. 7A:7E-5B and thus violated CAFRA's mandate in N.J.S.A. 13:19-10 that DEP issue a permit "only upon a finding that the proposed development . . . [w]ould cause minimal feasible interference with the natural functioning of plant, animal, fish, and human life processes at the site and within the surrounding region."  N.J.S.A. 13:19-10(e).

## I.  GENERAL LEGAL PRINCIPLES

Except for certain construction activities expressly exempted from permitting in N.J.S.A. 13:19-5.2, and not applicable here, CAFRA requires developers and property owners to obtain a coastal permit from DEP before undertaking "the

_____

[9] As noted, related appeals challenging the local municipal approvals were also filed (Docket No. A-2814-11 and Docket No. A-2958-12).

14                                        A-4880-11T2

construction . . . of any building or structure and all site preparation therefor, . . . includ[ing] . . . commercial development" in a coastal area.  N.J.S.A. 13:19-3 (definition of "development"); N.J.S.A. 13:19-5.  DEP exercises its CAFRA permitting authority through various regulations, specifically: (1) the Coastal Permit Program (CPP) Rules, N.J.A.C. 7:7-1.1 to -10.7, which "establish[] the procedures by which [DEP] will review permit applications and appeals from permit decisions," N.J.A.C. 7:7-1.1(a); and (2) the Coastal Zone Management (CZM) Rules, N.J.A.C. 7:7E-1.1 to -8.22, which "present[] the substantive rules . . . regarding the use and development of coastal resources," N.J.A.C. 7:7E-1.1(a).  See In re N.J.A.C. 7:1B-1.1 et seq., 431 N.J. Super. 100, 120 (App. Div.) (distinguishing the different groups), certif. denied, 216 N.J. 363 (2013).

In In re Protest of Coastal Permit Program Rules, 354 N.J. Super. 293, 332 (App. Div. 2002), we held that "DEP must make findings under the [general] standards in N.J.S.A. 13:19-10, even if DEP finds that a CAFRA permit application complies with its specific regulations."  N.J.S.A. 13:19-10 declares that

> [a] permit may be issued pursuant to this act [CAFRA] only upon a finding that the proposed development:
>
> . . . .

> e. Would cause minimal feasible interference with the natural functioning of plant, animal, fish, and human life processes at the site and within the surrounding region.
>
> . . . .
>
> g. Would result in minimal practicable degradation of unique or irreplaceable land types, historical or archeological areas, and existing public scenic attributes at the site and within the surrounding region.

Our role in reviewing an agency's decision is limited. In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013). We will not reverse its decision "because of doubts as to its wisdom or because the record may support more than one result." In re N.J. Pinelands Comm'n Resolution, 356 N.J. Super. 363, 372 (App. Div.), certif. denied, 176 N.J. 281 (2003). To reverse a decision, we must find: "(1) it was arbitrary, capricious, or unreasonable; (2) it violated express or implied legislative policies; (3) it offended the State or Federal Constitution; or (4) the findings on which it was based were not supported by substantial, credible evidence in the record." Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot., 191 N.J. 38, 48 (2007).

Moreover, we must extend substantial deference to an agency's interpretation and application of its own regulations,

particularly on technical matters within the agency's special expertise. In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 488-89 (2004). However, "[w]hile we must defer to the agency's expertise, we need not surrender to it." N.J. Chapter of Nat'l Ass'n of Indus. & Office Parks v. N.J. Dep't of Envtl. Prot., 241 N.J. Super. 145, 165 (App. Div.), certif. denied, 122 N.J. 374 (1990).

Furthermore, a court is never bound by an agency's determination of a purely legal issue. In re Stream Encroachment Permit, 402 N.J. Super. 587, 597 (App. Div. 2008) (citing Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). When "the issue involves the interpretation of statutes and regulations, it is a purely legal issue, which we consider de novo." Klawitter v. City of Trenton, 398 N.J. Super. 302, 318 (App. Div. 2007).

Before DEP issued the permit in this case, we held in Dragon v. New Jersey Department of Environmental Protection, 405 N.J. Super. 478 (App. Div.), certif. denied, 199 N.J. 517 (2009), that even though DEP has authority to settle disputed issues regarding its issuance of a permit, id. at 491, the agency cannot use its litigation settlement process to waive strict compliance with its substantive CZM Rules in order to circumvent CAFRA's permitting requirements. Id. at 492; see

also In re N.J.A.C. 7:1B-1.1, supra, 431 N.J. Super. at 125, 128 (also upholding new universal waiver rules). Accord In re CAFRA Permit No. 87-0959-5 Issued to Gateway Assocs., 152 N.J. 287, 308 (1997); SMB Assocs. v. N.J. Dep't of Envtl. Prot., 264 N.J. Super. 38, 50 (App. Div. 1993), aff'd on other grounds, 137 N.J. 58 (1994).

## II. ENDANGERED AND THREATENED SPECIES HABITAT, N.J.A.C.7:7E-3.38

N.J.A.C. 7:7E-3.38(a) defines "[e]ndangered or threatened wildlife or plant species habitats" as "areas known to be inhabited" by such species "on a seasonal or permanent basis," or in the alternative, as areas known "to be critical at any stage in the life cycle of any" such species. Also deemed a part of those habitats is "a sufficient buffer area to ensure continued survival of the population of the species as well as areas that serve an essential role as corridors for movement of endangered or threatened wildlife."

These areas have been singled out as deserving of special protection. Thus, N.J.A.C. 7:7E-3.38(b) states:

> Development of endangered or threatened
> wildlife or plant species habitat is
> prohibited unless it can be demonstrated,
> through an Endangered or Threatened Wildlife
> or Plant Species Impact Assessment as
> described at N.J.A.C. 7:7E-3C.2, that
> endangered or threatened wildlife or plant
> species habitat would not directly or
> through secondary impacts on the relevant

site or in the surrounding area be adversely affected.

[(emphasis added).]

"Applicants for development of sites that contain or abut areas mapped as endangered or threatened wildlife species habitat" shall "[d]emonstrate compliance with [N.J.A.C. 7:7E-3.38] by conducting an Endangered or Threatened Wildlife Species Impact Assessment in accordance with N.J.A.C. 7:7E-3C.2[.]" N.J.A.C. 7:7E-3.38(c)(1). According to N.J.A.C. 7:7E-3C.2(a), the submitted assessment must "demonstrate that the proposed development will not negatively affect the population(s) or habitat of [the] endangered or threatened wildlife species that resulted in identification of the site, or an area abutting the site, as endangered or threatened wildlife species habitat[.]" N.J.A.C. 7:7E-3C.2(c) requires that

> [i]mpact assessments [] be conducted for each endangered or threatened wildlife or plant species . . . . The impact assessment shall consider the likely affects of the proposed development on the local populations of the particular species on or abutting the site. The impacts shall be assessed using accepted ecological principles and scientific literature on each species and both direct and indirect impacts of the proposed development shall be considered. This assessment shall be based on habitat requirements and life history of each species, and the manner in which the proposed development may alter habitat, including, but not limited to, vegetation, soils, substrate, bathymetry, salinity,

hydrology, wildlife movement corridors, human disturbance, and effects on competitor, parasite, or predator species.

In its 2012 Environmental Report, DLUR acknowledged that Jaylin's project would cause the direct loss of pine snake habitat on the construction site and "could result in a number of secondary impacts." However, it found that such impacts would not result "in an overall adverse impact" to the local pine snake population on the property or in the surrounding area. That is, the impacts would cause no net loss due to Jaylin's proposed enhancement activities both on and immediately adjacent to the development, including the barrier wall.[10]

---

[10] In its 2012 Responses to Public Comments, DLUR explained:

> [T]he applicant proposes the permanent preservation of 20.9± acres of on-site forested/vegetated open space to serve as a corridor linking the on-site habitat with the thousands of acres of adjoining habitat located directly across the Conrail railroad ROW [right-of-way]. Within this corridor, the applicant proposes northern pine snake habitat enhancement initiatives. Directly across the Conrail ROW, the applicant purchased 21 acres that border the lands that are presently pine snake habitat and are planned to be preserved pursuant to the Heritage Minerals settlement. This 21-acre parcel provides a direct link between the hibernaculum and the pine snake habitat preserved onsite and the existing pine snake habitat that is on the Heritage Minerals parcel, planned for future permanent preservation. Moreover, this

(continued)

Furthermore, Jaylin's preservation and enhancement of the additional mitigation parcels would improve pine snake habitat in the surrounding area.[11]  Thus, DLUR concluded that the project met the requirements in N.J.A.C. 7:7E-3.38(b) based on Jaylin's implementation of protective measures on its construction site, its acquisition of 192 acres of pine snake habitat in the area, the overall increase in habitat value as shown by the HEM, and the existing adjoining contiguous pine snake habitat on the Heritage Minerals lands.

---

(continued)
> mitigation property includes habitat characteristics that are preferred by northern pine snake . . . .  The mitigation property fills a crucial gap that results in an overall contiguous area of more than 21 square miles of preserved lands.

[11] As part of its 2012 Responses, DLUR further explained:

> The applicant has purchased five outparcels that will also fill gaps in the overall protected lands in Manchester Township. These properties lie beyond the home-range of the two snakes documented on the development site, but they will contribute significantly to the protection of the northern pine snakes in the northeastern region of the Pinelands.  The acquisition of these properties prevents further curtailment of pine snake habitat and diminishes the risk of limiting genetic diversity among pine snakes in this region due to isolation.  Thus, the applicant has gone to extraordinary lengths to ensure the protection of the northern pine snake in accord with the Department's mission . . . .

Appellants challenge this determination, specifically arguing that that no development can occur on Jaylin's construction site because: (1) N.J.A.C. 7:7E-3.38 does not allow "net" habitat values, as it prohibits any development that will adversely affect the protected habitat either on the site or in the surrounding area; (2) DEP cannot consider any mitigation generally allowed by N.J.A.C. 7:7E-1.6 to meet the requirements in N.J.A.C. 7:7E-3.38 for a CAFRA permit; (3) in any event, using off-site parcels exhibiting a regional population cannot mitigate impacts to the local habitat on or near the construction site, especially if the off-site parcels are outside DEP's CAFRA jurisdiction; (4) Jaylin and DEP failed to use accepted ecological principles and current scientific literature in developing and applying the HEM; and (5) DEP did not formally consult its own Endangered and Nongame Species Advisory Committee (ENSAC), and did not consider the reports of its highly qualified experts who study northern pine snakes.  In support of these arguments, appellants stress that DEP had denied Jaylin's 2009 application because of the adverse impacts to pine snake habitat, but then, without adequate explanation, granted Jaylin's 2010 revised application even though it proposed the same building footprints, parking lot and snake barrier wall.  We disagree with all of these contentions.

## A.   "NET" CALCULATION

In arguing that N.J.A.C. 7:7E-3.38 prohibits a "net" habitat value calculation, appellants read the development prohibition in subsection (b), N.J.A.C. 7:7E-3.38(b), too expansively.  Neither the regulation nor CAFRA expressly precludes using a "net" computation for assessing the impact of development.

In adopting CAFRA, the Legislature accepted that coastal management involves the balancing of competing interests and that impacts to special areas and populations are unavoidable in some instances.  In N.J.S.A. 13:19-2, the Legislature

> recognizes the legitimate economic aspirations of the inhabitants of the coastal area and wishes to encourage the development of compatible land uses in order to improve the overall economic position of the inhabitants of that area within the framework of a comprehensive environmental design strategy which preserves the most ecologically sensitive and fragile area from inappropriate development and provides adequate environmental safeguards for the construction of any developments in the coastal area.

This balancing can be seen in one of the findings DEP is required to make before issuing any CAFRA coastal permit; that is, DEP must find that the proposed development "[w]ould cause minimal feasible interference with the natural functioning of plant, animal, fish, and human life processes at the site and

within the surrounding region."  N.J.S.A. 13:19-10(e) (emphasis added).  Thus, we find no error in using a "net" calculation.

### B.  OFF-SITE MITIGATION

Nor is DEP prohibited from using off-site mitigation to meet N.J.A.C. 7:7E-3.38.  There is nothing in that regulation expressly preventing an applicant from proposing mitigation at the development site, in the surrounding area or off-site, in order to reverse the potential impact from its project to an endangered and threatened species habitat.  Indeed, N.J.A.C. 7:7E-3.38 is not like other CZM Rules for "Special Areas," such as N.J.A.C. 7:7E-3.15 (intertidal and subtidal shallows) and N.J.A.C. 7:7E-3.27 (wetlands), that expressly require certain specific mitigation proposals.[12]

Although N.J.A.C. 7:7E-3.38 is silent as to the use of any mitigation techniques, N.J.A.C. 7:7E-1.6 sets forth general mitigation principles for the CZM Rules.  N.J.A.C. 7:7E-1.6 states:

> (a) Mitigation shall be selectively considered on a case-by-case basis as compensation for the loss or degradation of a particular natural resource.  In general, mitigation should be similar in type and location to the resource disturbed or

---

[12] "Special Areas are areas that are so naturally valuable, important for human use, hazardous, sensitive to impact, or particular in their planning requirements, as to merit focused attention and special management rules."  N.J.A.C. 7:7E-3.1(a).

destroyed, that is, replacement in kind within the same watershed.  The Department will, however, <u>consider proposals for mitigation that differ in type and/or location from the disturbed or destroyed resource</u> provided the mitigation would provide a major contribution to meeting the coastal goals and supplemental policies at <u>N.J.A.C.</u> 7:7E-1.1(c).  Requirements for mitigation of a particular resource are addressed more specifically in each applicable Special Area Rules (<u>N.J.A.C.</u> 7:7E-3.1 through 3.49).

(b) Rationale:  This rule is intended to conserve those physical and biological values described under applicable Special Area rules, while allowing development consistent with acceptability criteria.  Use of this mitigation rule will result in real gain, or no net loss of habitat productivity or resource value.

[(emphasis added).]

In our view, since <u>N.J.A.C.</u> 7:7E-3.38 is silent as to mitigation, it must be read together and harmonized with the mitigation generally provided for in <u>N.J.A.C.</u> 7:7E-1.6, allowing for mitigation, both on-site and off-site, when reviewing the requirements in <u>N.J.A.C.</u> 7:7E-3.38 for permit issuance.  Indeed, "[s]tatutes and regulations <u>in pari materia</u> are to be construed together when helpful in resolving doubts or uncertainties in the ascertainment of legislative intent."  <u>Boyle v. Riti</u>, 175 <u>N.J. Super.</u> 158, 165 (App. Div. 1980).  "Moreover, 'regulations within the same [regulatory] scheme should, where feasible, be

read as consistent with each other.'" Czar, Inc. v. Heath, 398

N.J. Super. 133, 139 (App. Div. 2008) (alteration in original)

(quoting Van Orman v. Am. Ins. Co., 608 F. Supp. 13 (D.N.J.

1984)), aff'd as modified on other grounds, 198 N.J. 195 (2009).

Thus, by its very terms, N.J.A.C. 7:7E-1.6 allows mitigation onsite generally or off-site at another location, albeit with conditions. In fact, when the CZM Rules were readopted in 2003, DEP declared as to N.J.A.C. 7:7E-1.6: "the Coastal Zone Management rules recognize that coastal management involves the balancing of competing interests. As such, the rules recognize that in certain situations impacts to special areas are unavoidable. Therefore, mitigation is required as a measure to lessen the impacts of that development." 35 N.J.R. 632(a) (Feb. 3, 2003) (DEP's response to comment #34).

In addition, the coastal regulations define "site" as "the lot or lots upon which a proposed development is to be constructed." N.J.A.C. 7:7-1.3 (emphasis added); N.J.A.C. 7:7E-1.8(a) (emphasis added). In applying the CZM Rules to a site, the CPP Rules require DEP to consider the "[p]roperty as a whole," which means "all property assembled as one investment or to further one development plan[,]" regardless of the number of lots involved. N.J.A.C. 7:7-1.3. Those definitions of "site" and "[p]roperty as a whole" do not specify that the lots on

which the "regulated activity" will occur must be contiguous. Harmonized with the prior regulations, the three rules together demonstrate that, unless otherwise expressly required, the lots on which the regulated activity and the mitigation occur do not have to be contiguous to reverse or minimize the potential development impact to a special area, such as an endangered or threatened species habitat.

In arguing specifically that off-site mitigation is precluded by regulation, appellants also define "population" in N.J.A.C. 7:7E-3C.2 too narrowly. While N.J.A.C. 7:7E-3C.2(c) declares that the "[i]mpact assessments" shall consider the "likely" effects on the "local population," N.J.A.C. 7:7E-3C.2(a) does not limit itself to the "local population." Rather, N.J.A.C. 7:7E-3C.2(a) declares that the applicant's submitted information must demonstrate that the proposed development "will not negatively affect the population(s) or habitat of endangered or threatened wildlife species that resulted in identification of the site, or an area abutting the site, as endangered or threatened wildlife species habitat." When there is limiting language in one part of an enactment, but it is left out of another section, the omission is viewed as intentional. In re N.J.A.C. 7:1B-1.1, supra, 431 N.J. Super. at 119 (citing Ryan v. Renny, 203 N.J. 37, 58 (2010)). Thus,

although the impact assessment must consider construction impacts on the local snake population, which DEP did in this instance,[13] DEP's review of those impacts must be assessed against the entire regional population.

Therefore, even though there is evidence suggesting that the pine snakes on the construction site would likely not interact with the pine snakes on the mitigation sites, we find (1) that DEP did not err by concluding that mitigation can occur in areas on, adjacent to, or off the construction site, N.J.A.C. 7:7-1.3, 7:7E-1.6, and 7:7E-1.8, so long as there are no net direct or secondary negative impacts to the habitat on the site or surrounding area, N.J.A.C. 7:7E-3.38, 7:7E-3C.2(c); and (2) that DEP's assessment of the project's impacts, including any barriers, properly took into account the entire pine snake

---

[13] In its 2012 Responses to Public Comments, expressing concern that the proposed mitigation properties will not support the local pine snake population, DLUR wrote:

> For the purposes of assessing the offsetting measures proposed by the applicant, the Department considered the losses and benefits to pine snake habitat within the population of pine snakes located in the northeast region of Ocean County. A "population" is generally understood to be the number of individuals within a given area. It is acceptable (and reasonable) to take a broad approach in evaluating the habitat losses or gains to a particular population.

population, not just the local population, N.J.A.C. 7:7E-3C.2(a).  In sum, we conclude that DEP did not err by considering all of the mitigation areas when it reviewed whether Jaylin's proposal met the permitting requirements in N.J.A.C. 7:7E-3.38.[14]

### C.  DIFFERENT PERMIT APPLICATION OUTCOMES AND DEP'S HABITAT EVALUATION METHOD

Appellants next point out that DEP denied Jaylin's 2009 application after finding adverse impacts to pine snake habitat from Jaylin's proposal, but then granted its 2010 revised application although those two applications proposed similar building footprints, parking lots and snake barrier walls.  We discern no agency inconsistency here because there were two main differences in these applications, which resulted in DEP's disparate outcomes.

---

[14] To be sure, in its denial of Jaylin's 2004 application, DEP declared that N.J.A.C. 7:7E-3.38 "does not contemplate mitigation since adverse impacts are specifically prohibited." To the extent the agency now suggests its mitigation review of Jaylin's proposal did not include the off-site parcels, we disagree.  In its review of Jaylin's later applications, DEP explained that it considered and used "only the proposed habitat enhancements on the lands permanently preserved by the applicants" to "offset the estimated loss in habitat value that would occur in the development area."  In other words, DEP did include in its review those areas where Jaylin proposed to construct snake habitat enhancements, and many of these areas were on the mitigation parcels and not on the construction site itself.  As already noted, we find no error with the agency's approach to including the mitigation parcels in its review.

First, along with its 2010 revised application, Jaylin agreed to acquire and grant DEP conservation restrictions on 192 additional acres in Manchester Township on DEP mapped areas with multiple pine snake habitats, which, as previously noted, were properly taken into account in the agency's "net" habitat value calculation.

Second, DLUR applied DEP's new HEM for northern pine snakes only to Jaylin's 2010 revised application, finding that the proposed activities would not adversely affect that snake population or habitat. Moreover, contrary to appellants' claims, the record shows that DEP used accepted ecological principles and current scientific literature and species mapping in developing and applying the HEM to Jaylin's 2010 revised application.

That is, according to an August 2010 report detailing the HEM by the DFW, entitled "Conceptual Habitat Evaluation Method for Northern Pine Snakes," DEP solicited, received and incorporated input from various pine snake experts in its preparation of the HEM and utilized current scientific literature and habitat mapping and existing federal methodology for habitat evaluation in both developing and applying the HEM to determine whether Jaylin's project complied with N.J.A.C. 7:7E-3.38.

One of the fundamental considerations in reviewing an agency's policymaking and factfinding is that a court may not substitute its judgment for the agency's expertise. In re Distrib. of Liquid Assets Upon Dissolution of Union Cnty. Reg'l High Sch. Dist. No. 1, 168 N.J. 1, 10-11 (2001). Consequently, DEP's interpretation of scientific data, although not binding, "is entitled to substantial weight." N.J. Chapter of Nat'l Ass'n of Indus. & Office Parks, supra, 241 N.J. Super. at 165. This is particularly true when the matter involves complex scientific methodologies. GAF Corp. v. N.J. Dep't of Envtl. Prot., 214 N.J. Super. 446, 452-53 (App. Div. 1986). Thus, we find that DEP's different decisions on Jaylin's two permit applications were neither improper nor inconsistent. Furthermore, because the HEM methodology involved complex computer-based evaluations and actual field assessments by DEP's ENSP staff, we defer to the agency's expertise as to the ecological principles and scientific literature the DFW used in developing and applying the HEM.

And contrary to appellants' additional claim, DEP did not err by having its DFW and ENSP staff develop and apply the HEM without formal input from the ENSAC, as that Committee has no responsibility to advise the DEP Commissioner on whether endangered and threatened species habitats can be developed

under CAFRA, or on how to develop them under CAFRA's policies. Indeed, even EELC concedes that there is "no legal obligation" for DEP to adopt the Committee's recommendations.[15]

For all these reasons then, we conclude that DEP did not waive or fail to comply with its substantive regulations concerning endangered and threatened species habitat, N.J.A.C. 7:7E-3.38, when it granted the CAFRA permit to Jaylin.

> **[At the direction of the court, per R. 1:36-2(a), the discussions of Sections III, IV and V in this appeal have been omitted from the published version of the opinion.]**

## VI.  IMPERVIOUS COVERAGE LIMITS, N.J.A.C. 7:7E-5B

Critical to DEP's 2012 Permit Approval was the agency's finding that the Toms River portion of the site is located within the Toms River Coastal Regional Center.  This designation allowed an eighty percent impervious cover percentage on that portion of the tract, rather than the otherwise permissible thirty percent coverage available in a Coastal Suburban Planning Area, which designation applies to the Manchester Township

---

[15] The Committee was established under The Endangered and Nongame Species Conservation Act, N.J.S.A. 23:2A-1 to -15.  N.J.S.A. 23:2A-7(e) states: "[t]he commissioner shall appoint a committee of experts to advise and assist the commissioner in carrying out the intent of this act.  Said experts shall include persons actively involved in the conservation of wildlife."  N.J.A.C. 7:25-4.18 states that the eleven members of the Committee, N.J.A.C. 7:25-4.18(a), "shall advise and assist the Commissioner in matters related to the intent of 'The Endangered and Nongame Species Act,'" N.J.A.C. 7:25-4.18(b).

portion of the construction site[16] and underlies Jaylin's entire property. Appellants challenge that determination as violative of the maximum limit allowed for that location by operation of N.J.A.C. 7:7E-5B.1 to -5B.6. Appellants argue that DEP's most recent ruling contradicts the agency's 2010 permit denial, which concluded that the Toms River Coastal Regional Center designation expired in February 2005 and had not been extended by virtue of the 2008 Permit Extension Act, N.J.S.A. 40:55D-136.1 to -136.6 (PEA), because the development site contains wetlands and threatened and endangered species habitat and is "environmentally sensitive" property, excluded from PEA coverage. Therefore, the development site is properly classified as the Coastal Suburban Planning zone, with a thirty percent impervious coverage limitation and not the eighty percent impervious coverage sought by Jaylin.

Determining the impervious limits for the site in question is complex, fact-intensive and sensitive, and reliant upon a provision of the PEA not heretofore judicially interpreted. Therefore, some background is in order.

---

[16] The Manchester Township portion of the site was outside this Coastal Regional Center and therefore remained subject to the underlying Coastal Suburban Planning Area's thirty percent cover limit.

The DEP's CZM Rules, N.J.A.C. 7:7E-5B.1 to -5B.6, limit the percentage of land in a site in the CAFRA area that can be covered with buildings, roads and other impervious structures. N.J.A.C. 7:7E-5B.4; N.J.A.C. 7:7E-1.8.  These limits are based on where the site is located on the CAFRA Planning Map, that is, in which of the following land area categories it sits: (1) a coastal center; (2) a Coastal Planning Area; (3) a CAFRA center, CAFRA core, or CAFRA node; and/or (4) a military installation. N.J.A.C. 7:7E-5B.1(a); N.J.A.C. 7:7E-5.3(a); N.J.A.C. 7:7E-5.4.

Higher percentages are allowed in more developed areas. For example, the impervious cover limit is:  (1) eighty percent for the Coastal Metropolitan Planning Area, CAFRA and coastal regional centers, CAFRA cores, and CAFRA nodes; (2) seventy percent for CAFRA and coastal towns; (3) thirty percent for the Coastal Suburban Planning Area within a sewer service area; (4) five percent for the Coastal Suburban Planning Area outside a sewer service area; and (5) three percent for the Coastal Environmentally Sensitive Planning Area.  N.J.A.C. 7:7E-5B.4. Even if the impervious cover for a project is acceptable within N.J.A.C. 7:7E-5B, DEP still "may reject or conditionally approve" a permit application "as reasonably necessary to," among other things, "[p]rotect . . . wildlife."  N.J.A.C. 7:7E-6.2(a)(2).

A-4880-11T2

It is undisputed that Jaylin's construction site is located on the CAFRA Planning Map within the boundaries of a "Coastal Suburban Planning Area" and within a sewer service area, subjecting it to a thirty percent impervious cover limit. N.J.A.C. 7:7E-5B.4. In addition, when Jaylin submitted its original 2004 application, the Toms River Township portion of its construction site was also listed within the boundaries of the "Toms River Coastal Regional Center," subjecting it to an eighty percent impervious cover limit. N.J.A.C. 7:7E-5B.4; 32 N.J.R. 503(a) (Feb. 7, 2000) (DEP adopts Toms River Coastal Regional Center). Significant for present purposes, if a site such as Jaylin's proposed development has portions in one or more of the land area categories, only the cover limits appropriate to each category apply to that particular portion. N.J.A.C. 7:7E-5B.3(i).

DEP used the community planning boundaries approved by the State Planning Commission in 1999 for the original land use boundaries on its CAFRA Planning Map. N.J.A.C. 7:7E-5B.3(a). See In re Protest of Coastal Permit Program Rules, supra, 354 N.J. Super. at 318-27 (detailed history). When the State Planning Commission approves any new or changed boundary, DEP is required to evaluate that boundary under CAFRA and then publish a notice of its intention to accept it, reject it or promulgate

a revised boundary for the CAFRA Planning Map. N.J.A.C. 7:7E-5B.3(b). The changed boundary then becomes operative thirty days from the date of publication. N.J.A.C. 7:7E-5B.3(c).

On February 7, 2005, the boundaries for the Toms River Regional Coastal Center expired, along with the boundaries for all coastal centers not located on barrier islands, oceanfront spits, or peninsulas in the CAFRA area. N.J.A.C. 7:7E-5B.6(a); 38 N.J.R. 928(c) (Feb. 6, 2006).

One year later, on February 6, 2006, DEP re-established those coastal center boundaries, and divided them into two new classes of coastal centers: mainland and non-mainland. N.J.A.C. 7:7E-5B.6(a); 38 N.J.R. 928(c), supra. Thus, the "mainland" Toms River Regional Coastal Center, with an eighty percent impervious cover limit, now applied to the portion of Jaylin's construction site in Toms River Township. 38 N.J.R. 928(c), supra.

Most critically, however, during the February 6, 2006 adoption of the mainland coastal centers, DEP enumerated six specific areas (including wetlands, endangered and threatened wildlife species habitats mapped on DEP's Landscape Maps and Coastal Critical Environmental Sites mapped on the CAFRA Planning Map) that could not be a part of any mainland coastal center's boundaries. N.J.A.C. 7:7E-5B.6(e). Development in any

of those areas would then be limited to the impervious cover limit of the underlying coastal planning area, here, the thirty percent Coastal Suburban Planning Area. N.J.A.C. 7:7E-5B.6(e); N.J.A.C. 7:7E-5B.6(g)(2). We have found no information in the record or in the New Jersey Register that DEP ever applied that regulation to the mainland Toms River Coastal Regional Center.

Nevertheless, if a CAFRA permit application (like Jaylin's 2004 application)[17] had been filed before February 7, 2005, had been assigned a DEP project number, had been deemed complete for final agency review before March 15, 2006, and had proposed development in a mainland coastal center that had not expired, the applicant could use the previously expired coastal center's boundaries and limit for impervious cover under N.J.A.C. 7:7E-5B.4, regardless of the six enumerated areas excluded from the mainland coastal center. N.J.A.C. 7:7E-5B.6(f).[18]

─────────────────────

[17] In the 2012 permit decision at issue here, DEP had calculated the total allowable impervious cover for Jaylin's development to be 18.836 acres. Jaylin proposed a total of 14.1075 acres of impervious cover: 11.960 acres, or 76.35%, of impervious cover in the Township of Toms River; and 2.1475 acres, or 10.22%, of impervious cover in the Suburban Planning Area of Manchester Township.

[18] Accordingly, in its June 2006 denial of Jaylin's 2004 application, DEP determined that the Toms River portion of the property was "governed by the impervious cover percentages allowed by . . . . Toms River Coastal Regional Center," which is eighty percent. Again, this determination was based on the

(continued)

Otherwise, if the application was filed after February 7, 2005 (like Jaylin's 2009 and 2010 applications), and was proposing development in a mainland coastal center, the applicant could use the impervious cover for that mainland coastal center only if the proposed development would take place inside that center's boundaries and not within one of the six enumerated areas and if the mainland coastal center's boundaries had not expired. N.J.A.C. 7:7E-5B.6(g)(1). If any part of the proposed development would be outside the mainland coastal center's boundaries or within one of the six enumerated areas, the applicant would have to use the impervious limits for the underlying Coastal Planning Area. N.J.A.C. 7:7E-5B.6(g)(2).[19]

On March 15, 2007, the boundaries of all mainland coastal centers expired. 39 N.J.R. 2018(b) (May 21, 2007) (listing expiration of Toms River Coastal Regional Center in Dover Township, Ocean County). DEP instructed permit applicants that "[t]he impervious cover limits . . . of the underlying Coastal Planning Area apply to the area encompassed by the former

_____

(continued)
application having been received by DEP prior to February 7, 2005, and being deemed complete prior to March 15, 2006.

[19] As noted, the underlying planning area across the entire site is a Coastal Suburban Planning Area, which authorizes a maximum of thirty percent impervious cover.

mainland coastal center boundary." Ibid.

Consequently, DLUR concluded in its March 2010 denial of Jaylin's 2009 application: (1) Jaylin's construction site had lost its mainland Toms River Coastal Regional Center designation when it expired, and impervious cover limits now were subject to the thirty percent for the underlying Coastal Suburban Planning Area; (2) the project improperly proposed impervious cover over thirty percent; and (3) the Permit Extension Act of 2008 (PEA), N.J.S.A. 40:55D-136.1 to -136.6, was not available to delay expiration of the mainland coastal regional center.

However, when DLUR approved Jaylin's 2010 revised application and issued the CAFRA permit in April 2012, it disregarded its previous conclusions and authorized Jaylin to develop the Toms River Township portion of its property up to an eighty percent impervious cover limit. DLUR relied on Jaylin's 2004 application, on N.J.A.C. 7:7E-5B.6(f) and, contrary to its previous position, on the PEA.

### A. APPLICATION OF N.J.A.C. 7:7E-5B.6(f)

To be sure, Jaylin's 2004 CAFRA application fits into N.J.A.C. 7:7E-5B.6(f), which states:

> For purposes of any CAFRA permit application that was received by the Department prior to February 7, 2005, assigned an agency project number pursuant to N.J.A.C. 7:7-4.4(a)1i or ii, and proposes a development in a mainland coastal center

> . . . that has not expired . . . , the
> impervious cover limits . . . shall be
> determined in accordance with N.J.A.C. 7:7E-
> 5B.4(d) [(permitting use of coastal regional
> centers for impervious cover)] . . . ,
> provided the CAFRA permit application is
> complete for final review pursuant to
> N.J.A.C. 7:7-4.6 prior to March 15, 2006.

That is, Jaylin had filed its 2004 application before February 7, 2005, had been assigned a DEP project number, had been deemed complete for final agency review before March 15, 2006, and had proposed development in a mainland coastal center that was not expired at that time.

We conclude, however, that it was error for DEP to have relied on Jaylin's original 2004 application, which had been denied in June 2006, to qualify the applicant for the eighty percent impervious cover limit of N.J.A.C. 7:7E-5B.4.

In its 2012 Environmental Report, DEP explained that the impervious cover requirement and coastal center designation existing at the time of the initial permit application applied because the revised permit application was submitted as part of the parties' continuing settlement discussions to resolve the initial permit denial, which was also pending appeal. In other words, according to DEP, Jaylin's 2009 and 2010 applications "relate[d] back" to its original 2004 application, which was "kept alive" by Jaylin's pending appeal of DEP's 2006 denial and by the agency's "alternate dispute resolution" (ADR) mechanism.

We disagree.

First, after DLUR formally rejected Jaylin's 2004 application, Jaylin filed a "new" application in 2009 and revised that application in 2010. That is, in September 2007, DEP's ODR ended ADR with Jaylin on the 2004 application, declaring that they were "unable to reach an agreement" and requesting that Jaylin's appeal of DLUR's permit denial be sent to the OAL for a hearing. The transfer never happened; instead, Jaylin participated in a pre-application conference with DEP, and the agency's representative "noted that the anticipated application would be a new application and would be reviewed under the revised design and the current regulations." In fact, Jaylin's counsel declared in a cover letter to its 2009 application that the application was "a resubmission" which "represents a significantly revised and reduced project that is proposed as a result of the 2006 denial." And even though DEP now labels Jaylin's 2009 application its "first revised permit application," DLUR referred to Jaylin's 2009 application in its 2012 Environmental Report, as "a second CAFRA permit application." N.J.A.C. 7:7-4.9(b), governing the withdrawal, resubmission, and amendment of applications, states:

> If an application is denied, the applicant may resubmit an application for a revised project of the same or reduced scope on the same site . . . . The resubmitted

> application will be treated as a new
> application, although references may be made
> to the previously submitted application. An
> applicant who wishes to appeal the denial,
> and at the same time revise the application
> may do so in accordance with procedures in
> N.J.A.C. 7:7-5.1 [(which covers hearing
> requests)].
>
> [(emphasis added).]

Furthermore, DEP assigned Jaylin's 2009 application a project file number different from its 2004 application. N.J.A.C. 7:7-4.4(a)(1). This is in contrast to when the agency applied the same 2009 application number to the revised 2010 application that Jaylin submitted during its settlement negotiations with DEP after it had requested a hearing or ADR on DEP's 2010 denial. N.J.A.C. 7:7-5.4(a), governing settlements in response to a hearing request, states: "Any applicant who has requested a hearing on a permit decision . . . may, at any time prior to rendering of an initial decision by the [OAL], submit a revised application for the purpose of negotiating a settlement."

Second, Jaylin had no vested rights in DLUR's using the original coastal center boundaries. The December 2011 stipulation of settlement gave Jaylin no such expectation as to the application of impervious cover limits. Indeed, it could not do so. Dragon, supra, 405 N.J. Super. at 491-92. As we have explained, the agency had denied Jaylin's 2004 application,

which DLUR noted in the stipulation along with Jaylin's submissions of revised and then amended applications. In fact, the stipulation declares that "the Department anticipates issuance of the requisite permits based on [Jaylin]'s 2009 revised submission." Also, Jaylin did not receive its local preliminary or final municipal approvals until 2010. Cf. Riggs v. Long Beach Twp., 101 N.J. 515, 521 (1986) ("[W]hen one party has obtained a vested right under the prior law, the later law may not be applied if this will divest that right.").

DEP's reliance on In re CAFRA Permit No. 87-0959-5 Issued to Gateway Assocs., supra, 152 N.J. at 287, to support its position that DLUR correctly issued the 2012 CAFRA permit by applying N.J.A.C. 7:7E-5B.6(f) to Jaylin's 2004 application is misplaced. In Gateway, supra, after issuing a permit, DEP asked the permit holder to file an application for modification because the policy had changed and the project no longer required intercept parking. Id. at 302. The permit holder did so, and the court, although declining to reach the issue due to the appeal's lack of timeliness, id. at 306, could not "conclude that the DEP abused its discretion by deciding to review only the modifications to Gateway's project" and not the original permit application that had been filed. Id. at 304.

Accordingly, we hold that DEP erred by relying on Jaylin's

2004 application and then by applying the impervious cover limits allowed by N.J.A.C. 7:7E-5B.6(f) to issue the CAFRA permit.  Instead, DEP should have applied the impervious cover limits in accordance with N.J.A.C. 7:7E-5B.6(g) to review the project proposed by Jaylin after 2005.

### B. APPLICATION OF N.J.A.C. 7:7E-5B.6(g)

Given that the impervious cover limits allowed by N.J.A.C. 7:7E-5B.6(f) were inapplicable to Jaylin's project (since DEP could not rely on Jaylin's 2004 permit application), and because, for reasons that follow, by virtue of the PEA, the mainland Toms River Coastal Regional Center had not expired when Jaylin submitted its 2009 application and 2010 revised application, DEP should have applied the impervious cover limits in N.J.A.C. 7:7E-5B.6(g) to review the project.

N.J.A.C. 7:7E-5B.6(g) states:

> For purposes of any CAFRA permit application that was received by the Department after February 6, 2005 and proposes a development in a mainland coastal center . . . that has not expired . . .:
>
> > 1. The impervious cover limits . . . for those portions of the site located within the mainland coastal center shall be determined [for the coastal regional center] . . . , provided no portion of the proposed development . . . is located outside the boundaries of the mainland coastal center, or in one of the [six

enumerated] areas identified [in N.J.A.C. 7:7E-5B.6(e)].

> 2. If any portion of the proposed development . . . is located outside of the mainland coastal center boundaries, or in one of the [six enumerated] areas identified [in N.J.A.C. 7:7E-5B.6(e)], then the impervious cover limits . . . for the entire development shall be determined . . . for the appropriate Coastal Planning Area.

> [(emphasis added).]

Here, we find that the provisions of N.J.A.C. 7:7E-5B.6(g) were applicable to Jaylin's project and 2009 application and 2010 revised application, because DEP received those applications after February 2005, and because, as DEP, Jaylin and appellant EELC correctly assert, the PEA had prevented the boundaries of the mainland Toms River Coastal Regional Center from expiring on March 15, 2007.

That is, on September 6, 2008, the Legislature adopted the PEA, which "automatically suspend[ed]" government "approval[s]" related to the physical "development" of property from running out during the "extension period," defined at present as "beginning January 1, 2007 and continuing through December 31, 2014." N.J.S.A. 40:55D-136.3 and -136.4(a).[20]

---

[20] Initially, on September 6, 2008, the "extension period" was defined as "beginning January 1, 2007 and continuing through July 1, 2010." L. 2008, c. 78, § 3. On January 18, 2010, it
(continued)

Under each version, the PEA broadly states:

> "Approval" means, except as otherwise provided in [N.J.S.A. 40:55D-136.4(b)], any . . . permit issued and <u>center designations</u> pursuant to [CAFRA], . . . <u>center designations pursuant to the "State Planning Act"</u>. . . . [and] any municipal, county, regional, or State approval or permit <u>granted</u> under the general authority conferred by State law or rule or regulation, or any other government <u>authorization of any development application or any permit related thereto</u> whether that authorization is in the form of a permit, approval, license, certification, permission, determination, interpretation, exemption, variance, exception, waiver, letter of interpretation, no further action letter, agreement or any other executive or administrative decision <u>which allows a development or governmental project to proceed</u>.
>
> [N.J.S.A. 40:55D-136.3 (emphasis added).]

According to that definition, "[a]pproval" includes center designations directly and is not limited, as appellants suggest, to actual agency permits or authorizations.[21] We accord

---

(continued)
was extended through December 31, 2012. L. 2009, c. 336, § 1. On September 19, 2012, it was extended through December 31, 2014. L. 2012, c. 48, § 2. The Act further states that no approval will be extended "more than six months beyond the conclusion of the extension period," or now until June 30, 2015, depending on the original expiration date of the approval in question. N.J.S.A. 40:55D-136.4(a).

[21] Since Toms River Township submitted its application for plan endorsement to the State Planning Commission in May 2006, we find that the exception to extension in N.J.S.A. 40:55D-

(continued)

statutory language its ordinary meaning.  <u>Town of Morristown v. Women's Club of Morristown</u>, 124 <u>N.J.</u> 605, 610 (1991).  Indeed, as expressly stated in the definition, the PEA extended center designations pursuant to CAFRA as well as center designations made pursuant to the State Planning Act, <u>N.J.S.A.</u> 40:55D-136.3.  The clear wording of the statute encompasses center designations and any contrary construction limiting the PEA to actual permits and approvals would render nugatory the additional terms employed in the definition of "approval."  On this score, it is not proper statutory construction to render a provision completely meaningless or superfluous.  <u>Bergen Commer. Bank v. Sisler</u>, 157 <u>N.J.</u> 188, 204 (1999).

Appellants further argue that the PEA does not apply here

(continued)
136.4(b)(7) does not apply to preclude any extension of the mainland Toms River Coastal Regional Center designation.  That provision declares that

> [n]othing . . . shall be deemed to extend or purport to extend:
>
> . . . .
>
> (7) any coastal center designated pursuant to [CAFRA] that <u>as of</u> March 15, 2007 (a) had not submitted an application for plan endorsement to the State Planning Commission, and (b) was not in compliance with the provisions of the Coastal Zone Management Rules at <u>N.J.A.C.</u> 7:7E-5B.6[.]
>
> [<u>N.J.S.A.</u> 40:55D-136.4(b)(7).]

47                                                      A-4880-11T2

because the development site contains both wetlands and threatened and endangered species habitat and thus comes within the "environmentally sensitive" property exclusion of N.J.S.A. 40:55D-136.4(b)(3), which provides: "Nothing [in this act] shall be deemed to extend or purport to extend . . . any permit or approval issued within any environmentally sensitive area . . . ."  However, the PEA specifically excludes from the definition of "environmentally sensitive area" "regional growth areas . . . designated in the comprehensive management plan [CMP] prepared and adopted by the Pinelands Commission . . . or similar areas designated by the [DEP]."  N.J.S.A. 40:55D-136.3. Jaylin's proposed site is located in a regional growth area and a suburban planning area and thus comes within the purview of the PEA.

In sum, because the limits allowed by N.J.A.C. 7:7E-5B.6(f) were inapplicable to Jaylin's project and because the PEA prevented the boundaries of the mainland Toms River Coastal Regional Center from expiring on March 15, 2007, we conclude that DLUR should have reviewed Jaylin's proposed project in its 2010 revised application under the impervious cover limits allowed by N.J.A.C. 7:7E-5B.6(g), as the agency did in its March

16, 2010 denial of Jaylin's 2009 revised application.[22]

The difficulty in applying N.J.A.C. 7:7E-5B.6(g) here, however, is that, in our view, the actual boundaries of the readopted (and extended by the PEA) mainland Toms River Coastal Regional Center, and therefore the boundaries of the Coastal Suburban Planning Area, are underline unclear. It appears from this record that DEP never determined, in the context of its review of Jaylin's 2010 revised permit application, whether any portion of the proposed "development" lies outside the boundaries of the mainland coastal center or whether any of the six enumerated areas listed in N.J.A.C. 7:7E-5B.6(e), which cannot be a part of any mainland coastal center, were found in the readopted mainland Toms River Coastal Regional Center before its March 2007 expiration and PEA extension. In addition, the agency also never determined, in this very same context, whether any of those six areas were found specifically on Jaylin's property within the mainland coastal center. These findings are critical because, pursuant to N.J.A.C. 7:7E-5B.6(g)(1) and (2), they determine in turn the applicable impervious cover limits. As

---

[22] In its March 16, 2010 decision not to approve Jaylin's 2009 permit application, the DLUR, relying on N.J.A.C. 7:7E-5B.6(g), found that the project's "impervious coverage shall be determined by N.J.A.C. 7:7E-5B.4(e)" "for the appropriate Coastal Planning Area," which in this case is a Coastal Suburban Planning Area, limiting impervious cover to thirty percent.

noted, if any portion of the proposed development is located outside of the center boundaries, or one of the areas identified at (e), then the impervious cover limits are determined in accordance with N.J.A.C. 7:7E-5B.4(e) for the appropriate Coastal Planning Area, which in this case is a Coastal Suburban Planning Area, subject to impervious cover limits of thirty percent.

DEP, of course, is in the best position to evaluate the proposal under the applicable regulation. "In general, available and appropriate 'administrative remedies should be fully explored before judicial action is sanctioned.'" Abbott v. Burke, 100 N.J. 269, 296 (1985) (quoting Garrow v. Elizabeth Gen. Hosp. & Dispensary, 79 N.J. 549, 558 (1979)). Accordingly, we reverse issuance of the permit and remand the matter to DEP with instructions to apply N.J.A.C. 7:7E-5B.6(e) and determine whether the applicable mainland coastal center's boundaries were properly set when they were readopted, and then to apply the appropriate impervious cover limits pursuant to N.J.A.C. 7:7E-5B.6(g) and N.J.A.C. 7:7E-5B.4 to Jaylin's latest proposal, including determining whether any of the six areas listed in N.J.A.C. 7:7E-5B.6(e) exist on Jaylin's property, before issuing a CAFRA permit.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4880-11T2